UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MAINE FOREST PRODUCTS COUNCIL, PEPIN LUMBER, INC., and STÉPHANE AUDET, <br><br> Plaintiffs, <br><br> v. <br><br> PATTY CORMIER, in her official Capacity as DIRECTOR OF THE MAINE BUREAU OF FORESTRY, and AARON FREY, in his official capacity as ATTORNEY GENERAL FOR THE STATE OF MAINE, <br><br> Defendants. | 1:21-cv-00286-JAW |

**ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

An employer, employee, and non-profit industry association seek a preliminary injunction against state of Maine officials to preclude the enforcement of a logging industry regulation, arguing that it is preempted and violates the equal protection clauses of the United States and Maine constitutions. The Court concludes that the law is preempted by the Immigration and Nationality Act and accordingly enjoins enforcement of the law.

**I.   PROCEDURAL HISTORY**

On October 7, 2021, Maine Forest Products Council, Pepin Lumber, Inc., and Stéphane Audet (the Plaintiffs) filed a three-count complaint against Patty Cormier, in her official capacity as the Director of the Maine Bureau of Forestry, and Aaron Frey, in his official capacity as Attorney General for the state of Maine (the

Defendants), alleging that Public Law Chapter 280 (An Act Regarding the Transportation of Forest Products in the Forest Products Industry) (The Act or Public Law 280) violates (1) the Supremacy Clause of the United States Constitution, (2) the Equal Protection Clause of the United States Constitution, and (3) the Equal Protection Clause of the Maine Constitution. *Compl.* (ECF No. 1). The same day, the Plaintiffs moved for a preliminary injunction and temporary restraining order (TRO). *Pls.' Mot. for Prelim. Inj. and TRO* (ECF No. 3) (*Pls.' Mot.*). Also on October 7, 2021, during a conference with counsel, the Court issued an oral order dismissing without prejudice the Plaintiffs' motion for a TRO on the parties' agreement that the Defendants would not enforce the provisions of the Act pending further order of the Court. *Oral Orders* (ECF Nos. 13 & 19). The parties thereafter agreed to proceed solely on the Plaintiffs' motion for preliminary injunction. *Min. Entry* (ECF No. 18).

On November 1, 2021, the Defendants responded in opposition to the Plaintiffs' motion for preliminary injunction. *Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj.* (ECF No. 23) (*Defs.' Opp'n*). On November 10, 2021, the Plaintiffs replied to the Defendants' opposition. *Pls.' Reply Mem. in Support of Mot. for Prelim. Inj.* (ECF No. 25) (*Pls.' Reply*).

## II.   FACTUAL BACKGROUND

The Court recites the factual background from the Complaint and the Plaintiffs' and the Defendants' statements of fact, as well as their declarations.[1]

---

[1] For purposes of this motion, the parties do not dispute the facts presented.

###### A.      The Parties

Maine Forest Products Council (MFPC) is a non-profit industry association, incorporated in the state of Maine, organized to represent the interests of the forest products industry in Maine.  *Compl.* at ¶ 1; *Decl. of Patrick Strauch* ¶ 3 (ECF No. 6) (*Strauch Decl.*)  Its membership includes landowners, papermills, loggers, truckers, and other entities operating in the Maine forest products economy.  *Compl.* ¶ 1; *Strauch Decl.* ¶ 3.  Among MFPC's membership are landowners owning more than 50,000 acres in Maine who frequently contract with independent logging companies to cut and haul logs point-to-point within the state of Maine.  *Compl.* ¶ 2.  MFPC provides a variety of services to its members including advocacy before the executive and legislative branches of state and federal government.  *Strauch Decl.* ¶ 4.

Pepin Lumber, Inc. (Pepin Lumber) is a logging company incorporated in the state of Maine.  *Compl.* ¶ 3.  Its principal owner and president, Maurice Pepin, is a citizen of Canada and maintains his permanent residence in Québec.  *Id.*  Pepin Lumber provides logging services to landowners in Maine, including MFPC members. *Id.*  Approximately 85% of Pepin Lumber's revenue comes from its hauling and transportation services, whereby the company supplies tractor trailers and drivers to haul logs cut on property within the state of Maine.  *Id.*; *Decl. of Cédric Pepin* ¶ 6 (ECF No. 4) (*Pepin Decl.*).   The other 15% of Pepin Lumber's business comes from road building services.  *Pepin Decl.* ¶ 6.  Pepin Lumber operates in Coburn Gore, Maine, a remote, unorganized township in the northwest part of the state on the border with Canada. *Id.* ¶ 5; *Compl.* ¶ 4. Because of Pepin Lumber's remote location, it has had difficulty both in the past and present finding United States workers and

frequently sponsors visa applications for temporary foreign workers under the United States H-2A visa program created by the federal Immigration and Nationality Act (INA). *Compl.* ¶ 4; *Pepin Decl.* ¶ 6.

Consistent with past years, a significant proportion of Pepin Lumber's current tractor trailer drivers includes temporary foreign workers lawfully admitted into the United States on H-2A visas for the purpose of operating tractor trailers in the logging industry. *Compl.* ¶ 4. On May 25, 2021, the United States Department of Labor (DOL) issued an "Approval of H-2A Temporary Labor Certification" allowing Pepin Lumber to hire up to thirteen temporary foreign workers to serve as log truck drivers from June 14, 2021, until April 13, 2022. *Pepin Decl.* ¶ 12. On June 1, 2021, Pepin Lumber petitioned the United States Citizenship and Immigration Services (USCIS) to issue H-2A visas for the thirteen foreign workers Pepin Lumber intended to employ in its "Log Truck Driver Tractor Trailer" position. *Id.* ¶ 13. On July 9, 2021, USCIS issued a "Notice of Action" approving Pepin Lumber's petition for up to thirteen H-2A visas for this position. *Id.* ¶ 14. Pepin Lumber currently employs six Canadian citizens who are authorized to work on H-2A visas until April 13, 2022. *Id.* ¶¶ 15, 20.

Stéphane Audet is a Canadian citizen employed by Pepin Lumber as a tractor trailer driver. *Compl.* ¶ 5; *Decl. of Stéphane Audet* ¶ 3 (ECF No. 5) (*Audet Decl.*). The federal government granted Mr. Audet an H-2A visa and he entered the United States on July 12, 2021. *Audet Decl.* ¶ 8. Mr. Audet is lawfully authorized to reside and work in the United States as a tractor trailer operator for Pepin Lumber until

April 2022.  *Id.*; *Compl.* ¶ 5.  More than 85% of Mr. Audet's job involves hauling logs point-to-point within the state of Maine.  *Audet Decl.* ¶ 4.  Mr. Audet has worked for Pepin Lumber as a truck driver on an H-2A visa for several years.  *Id.* ¶ 10.

Patty Cormier serves as the Director of the Maine Bureau of Forestry within the Maine Department of Agriculture, Conservation, and Forestry, and is charged by Maine law with the authority to enforce the Act.  *Compl.* ¶ 6.  Aaron Frey is the Attorney General of the state of Maine and is also charged by Maine law with the authority to enforce the Act.  *Id.* ¶ 7.

### B.     Public Law 280

Without the Governor's signature,[2] on June 19, 2021, the state of Maine enacted Public Law 280 (introduced as L.D. 188), An Act Regarding the Transportation of Products in the Forest Products Industry.  *Compl.*, Attach. 1 at 2-3, An Act Regarding the Transportation of Products in the Forest Products Industry (P.L. 2021, ch. 208).  The Act substantively changes Titles 10 and 12 of the Maine Revised Statutes, amending 10 M.R.S. § 2364-B and enacting 12 M.R.S. § 8006.  *See* P.L. 2021, ch. 280, §§ 1-6.  As both parties note, the amendments to Title 12 contain the substantive provisions of the Act, while the amendments to Title 10 aid in its enforcement.  *See Pls.' Mot.* at 7; *Defs.' Mot.* at 1 n.1.

---

[2]     If, within ten days of receiving a bill from the Maine Legislature, the Governor does not sign the bill into law or veto the bill and the Legislature is still in session, the bill automatically becomes law.  *See* ME. CONST. art. IV, pt. 3, § 2; *Opinion of the Justices of the Supreme Judicial Ct. Given under the Provisions of Art. VI, Section 3 of the Me. Const.*, 2015 ME 107, ¶ 29, 123 A.3d 494 ("During the session, the Government has three options when a bill is presented to [her]: (1) [she] can sign the bill into law; (2) [she] can withhold [her] signature, which, after ten days, as 'the same force and effect as if the Government had signed it'; or (3) [she] can object to the bill and send the bill and [her] objections back to the Legislature within ten days").

Section 8006, which is to be codified under Title 12 and contains the disputed portions of the law, governs intrastate transportation of forest products by nonresidents and creates two prohibitions in the transportation of forest products. P.L. 2021, ch. 280, § 6. First, the law prohibits landowners from hiring certain non-residents for transporting forest products. The Act states in relevant part:

> A landowner[3] may not hire, or contract with a person to hire, a motor carrier[4] to transport forest products[5] that are harvested from the landowner's land from a location in the State to another location in the State unless the motor carrier is operated by a resident of the United States.

*Id.* Similarly, the law prohibits non-resident motor carriers from transporting forest products:

> A motor carrier may not transport forest products that are harvested from a landowner's land from a location in the State to another location in the State unless the motor carrier is operated by a resident of the United States.

*Id.* Relevant here, the Act expressly excludes from its definition of "resident of the United States" a person with an H-2A visa. *Id.* ("'Resident of the United States' does not include a person eligible to be in the United States under the United States H-2A visa program"). The Act imposes on both landowners and motor carriers who violate the Act a $1,000 fine for the first violation, $2,500 for the second, and $10,000 for the third and any subsequent violations. *Id.*

---

[3]  A "landowner" is any "person that owns 50,000 acres or more of forest land in [the state of Maine]." P.L. 2021, ch. 280, § 6.

[4]  "'Motor carrier' means a contract carrier, a common carrier or a private carrier of property by motor vehicle." P.L. 2021, ch. 280, § 6.

[5]  "'Forest Products' means logs, pulpwood, veneer, bold wood, wood chips, stud wood, poles, pilings, biomass fuel wood, fuel wood or other products commonly known as forest products, but does not include Christmas trees, maple syrup, nursery products used for ornamental purposes, wreaths, bough material, cones or other seed crops." 12 M.R.S. § 8881(3).

The Act further amends Title 10, Chapter 501, which governs "Weights and Measures." *See* 10 M.R.S. § 2301 *et. seq.* As currently enacted, a person transporting wood is required to carry a "trip ticket" that provides information about the wood's landowner, place of origin, haul date, name of hauler, etc. 10 M.R.S. § 2364-B. The Act amends the trip ticket requirement to also mandate "the owner of the land from which the wood [is] harvested [to affirm] that the load of wood is being transported in a legal manner consistent with state law." P.L. 2021, ch. 280, § 3. The Act further requires that the owner or manager of a log yard or mill site, in addition to the truck driver, be able to produce a copy of the trip ticket. *Id.* § 4.

On February 23, 2021, Maine Senate President, Troy Jackson, submitted testimony in favor of the Act to members of the Joint Standing Committee on Taxation.[6] *Compl.*, Attach. 3, *Test. in Supp. of LD 188* (*Jackson Test.*). In his testimony Senate President Jackson stated "that Maine loggers and truckers face an uphill battle competing against their counterparts in Canada, who benefit from a favorable exchange rate and government-sponsored insurance. This dynamic has depressed wages for Maine people working in the woods and handed large landowners extraordinary power in the industry." *Id.* at 2. The Act, as Senate President Jackson described it, is an "attempt to correct yet another injustice to Maine workers." *Id.* Senate President Jackson then stated that "[t]hroughout [his] time in the industry," Canadian drivers are permitted to "deliver international shipments into the U.S. and

---

[6]     Senator Jackson initially sponsored L.D. 188. State of Me. Legislature, *Summary of LD 188*, https://legislature.maine.gov/LawMakerWeb/summary.asp?paper=SP0076&SessionID=14          (last visited Feb. 16, 2022)

then pick up a load to be delivered back to Canada" but may not engage in point-to-point deliveries within the United States, known as "cabotage."[7]  *Id.*  As a result, "there is real confusion as to why the federal government would allow this practice under the H-2A visa program."  *Id.*  Thus, Senate President Jackson "strongly believe[s] that H-2A visas were not intended for this purpose, and to allow this practice is completely at odds with Homeland Security rules on cabotage . . . [and] [t]here is absolutely no way that Maine workers can compete with this interpretation of federal law."  *Id.* at 3.  As such, "[a]llowing drivers in this industry to misuse the H-2A program also flies in the face of one of the overarching principles of allowing H-2A visas – to protect the wages and conditions of U.S. workers."  *Id.*

## III.   THE PARTIES' POSITIONS

### A.   The Plaintiffs' Position

The Plaintiffs argue that they meet the first prong of the preliminary injunction standard—likelihood of success on the merits—because the INA preempts the Act and the Act violates the Equal Protection Clauses of both the United States and Maine Constitutions.  *Pls.' Mot.* at 10-11.

---

[7]      "Foreign-based trucks, busses, and taxicabs admitted under this section shall not engage in local traffic in the United States unless the vehicle comes within one of the following exceptions . . .." 19 C.F.R. § 123.14(c).  There are two exceptions.  One is that the "vehicle may carry merchandise or passengers between points in the United States if such carriage is incidental to the immediately prior or subsequent engagement of that vehicle in international traffic."  *Id.* § 123.14(c)(1).  The other is that a "foreign-based truck trailer may carry merchandise between points in the United States on its departure for a foreign country under the same conditions as are prescribed for 'other foreign railroad equipment' in § 123.12(a)(2)."  Section 123.12(a) allows the admission of foreign locomotives and other foreign railroad equipment into the United States without formal entry when used on a continuous route to proceed to the end of the run and depart for the foreign country.  *Id.* § 123.12(a).  Subsection (a)(2) addresses foreign locomotives and equipment making outward trips.  *Id.* § 123.12(a)(2).  Neither party contends that either exception affects this Court's decision.

Applying the theory of conflict preemption, the Plaintiffs contend that "Congress has exercised its authority to regulate immigration and aliens through the INA, which 'represents a comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Id.* at 11 (quoting *Toll v. Moreno*, 458 U.S. 1, 13 (1982)). They argue that the Act "not only serves as an 'obstacle'" to the H-2A visa program, but also "directly and purposefully contravenes federal law" because "[t]he H-2A visa program serves one clear policy objective: to assist United States employers in filling their labor needs where the current supply of United States labor does not provide a sufficient number of workers." *Id.* at 12. The Plaintiffs say "[t]he conflict [between the Act and the H-2A program] could not be more direct" because the Act "make[s] it illegal for certain H-2A visa recipients to perform the very duties which federal immigration law specifically authorizes them to come to the United States to perform." *Id.* The Plaintiffs cite *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012), arguing that in that case, the Second Circuit found that the INA preempted a statute barring "all lawfully present, nonimmigrant aliens from obtaining licensure as pharmacists," and a similar result should occur here. *Pls.' Mot.* at 13.

The Plaintiffs submit "[t]hat the drafter of the Act expressly intended to contravene and undermine federal law" and that the Act arose from the "drafter's erroneous 'belie[f] that the H-2A visas were not intended' to allow foreign workers to operate log trucks point-to-point in Maine, as the H-2A program specifically

authorizes." *Id.* at 14 (citing *Jackson Test.* at 2).  Thus, the Plaintiffs contend that the Act undermines federal law and "does not reflect a scenario where Maine sought to regulate in a traditional area of state police power and inadvertently encroached on federal authority." *Id.*

In their equal protection challenge the Plaintiffs first argue that the Court should apply strict scrutiny because the Act discriminates on the basis of alienage and therefore must be narrowly tailored to serve a compelling government interest. *Id.* at 15 (citing *Kandamar v. Gonzales*, 464 F.3d 65, 72 (1st Cir. 2006); *Bruns v. Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014)).  The Plaintiffs contend that the state of Maine has no compelling interest because "the federal government has authorized H-2A recipients to do [forest products transportation] work in Maine for years, and the legislative history of the Act reflects no findings of fact suggesting that the H-2A program has had any deleterious effect on any aspect of Maine life." *Id.* at 16. Instead, the Plaintiffs assert that the "Act arises merely from disagreement with federal law ultimately borne of labor market protectionism." *Id.*

The Plaintiffs further submit that the act is not "narrowly tailored" because elimination of H-2A workers "does not serve to improve the position of United States workers" because "employers can hire H-2A workers *only after* the federal government has certified no United States workers are available to fill the relevant job." *Id.* at 16 (emphasis in original).  The Plaintiffs again cite *Dandamudi* to support their position, noting that the Second Circuit in that case concluded that non-immigrant aliens are, like aliens generally, a suspect class, and, applying strict

10

scrutiny, found that the nonimmigrant pharmacists posed no health threat and the law was not narrowly tailored because there were other ways to limit any potential harm caused by employment of these professionals. *Id.* at 16-17.

As to the second factor in the preliminary injunction analysis, the Plaintiffs contend that they will suffer irreparable harm as a matter of law because the enforcement of the Act will violate their constitutional rights, and "compliance with a preempted law itself serves as a form of irreparable harm." *Id.* at 17. The Plaintiffs further argue that the MFPC will be irreparably harmed because the Act will result in an "immediate[] and permanent[] reduc[tion] [to the] labor force available to haul forest products in Maine, in turn reducing the capacity to transport those products and ultimately the supply of those products that can reach consumers." *Id.* at 18. The Act therefore "harms all downstream actors in the forest product industry, who will face supply chain disruptions and higher prices." *Id.*

As to Pepin Lumber, the Plaintiffs say "the Act means a substantial portion of its current corps of log truck drivers no longer will be permitted to do the job for which Pepin hire[d] them, hauling logs point-to-point in Maine." *Id.* The Plaintiffs argue that Pepin Lumber has historically had challenges finding workers, and "simply would not be in a position to replace" its H-2A visa holders were the Act effective. *Id.* As such, the Plaintiffs say "[t]he elimination of H-2A workers from Pepin Lumber's labor force will mean a permanent reduction in its capacity to haul logs and a permanent reduction in its revenue." *Id.* at 19. Finally, as to Mr. Audet, the Plaintiffs assert that "the Act prohibits [him] from doing the work for which he has received an

H-2A visa—hauling logs point-to-point within Maine—which constitutes approximately 85% of Audet's income." *Id.* Moreover, the Plaintiffs maintain that "stripping [Mr.] Audet of his ability to perform the duties authorized by the H-2A visa will likely cost him his H-2A visa status." *Id.*

Under the third preliminary injunction factor, the Plaintiffs contend that no substantial harm will result from injunctive relief because "the Act is likely unconstitutional, and as such Maine has no legitimate interest in enforcing it during the pendency of these proceedings." *Id.* Moreover, the Plaintiffs submit that injunctive relief will not harm Maine workers "as the federal H-2A visa program already requires [] employers to show, and DOL to certify, that employers cannot obtain United States workers to fill the jobs at issue." *Id.*

Lastly, the Plaintiffs claim that the public interest favors injunctive relief because the Act is likely preempted by federal law and "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Id.* (quoting *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997)).

### B.   The Defendant's Opposition

The Defendants argue that the "Court must begin with the presumption that the state statute is valid" because the Legislature has acted in a field traditionally occupied and regulated by the state. *Defs.' Opp'n* at 10-11 (quoting *Ouellette v. Mills*, 91 F. Supp. 3d 1, 7 (D. Me. 2015)). The Act, the Defendants assert, is "[c]onsistent with the State of Maine's police power to regulate labor relations and its forestry industry." *Id.* at 12. The purpose of the Act, the Defendants claim, "is to limit the

historic abuse of the federal H-2A visa program in the State's logging industry and to ensure the cornerstone of the federal program—to avoid adverse impacts of unauthorized alien workers on the domestic workforce—is safeguarded." *Id.* Thus, "[t]he Act regulates an area historically within the province of the states: enacting legislation to ensure the vibrance of local economies and to protect all authorized domestic workers, regardless of immigration status, from discrimination." *Id.*

Next, the Defendants urge that the Plaintiffs cannot establish impossibility preemption because "the INA does not mandate any action" by the Plaintiffs and "[n]o employer is forced to file a petition for approval of H-2A visas and no employer is forced to hire workers who are not already approved to work in the United States." *Id.* at 13. Thus, the Defendants say that because "the INA does not mandate the behavior at issue, Plaintiffs can remain in compliance with both laws." *Id.* As to Mr. Audet, the Defendants state that "even if the Act is enforced against him, his H-2A visa status is dependent on the availability of the temporary job he was hired to do." *Id.* Thus, "[i]f that job is no longer available to him, his authorization to work in the United States expires under the Automatic Revocation Provision." *Id.* at 13-14. Therefore, the Defendants argue that "federal law is consistent with the Act because the federal Automatic Revocation Provision is triggered when the position that Audet was hired to do is no longer available as a matter of state law." *Id.* at 14. The Defendants therefore submit that "even if the Act immediately applied to Plaintiff Audet, it would still be possible to comply with both federal and state law." *Id.*

The Defendants further contend that the Plaintiffs cannot establish obstacle preemption because the Act does not pose an obstacle to the H-2A visa program but instead "advanc[es] the purpose of the H-2A program [which is] to grant unauthorized aliens temporary, non-immigrant status only when their employment will not adversely affect domestic workers or local industry." *Id.* at 15. The Defendants assert that the Act is harmonious with H-2A visa eligibility rules because it only limits "driving a truck for a logging company transporting forest products that are harvested from a Maine landowner's land to another location in Maine—because (A) there are ample eligible domestic workers to do that job and (B) employing aliens via the H-2A visa program would adversely affect Maine's logging industry in particular and, as a result of fewer jobs and increased unemployment, its economy in general." *Id.* The Defendants dispute the Plaintiffs' reliance on *Dandamudi* and argue that the Second Circuit's holding was based on equal protection grounds, not preemption, and, here, unlike the law in *Dandamudi*, the Act advances, rather than inhibits, H-2A visa program goals. *Id.* at 16-17.

The Defendants argue that the Plaintiffs will not succeed on their equal protection claims, which the Defendants label an "as-applied," not facial, challenge. *Defs.' Mot.* at 6. The Defendants assert that the Act is consistent with the federal standards for treatment of aliens because the basis of the alleged disparate treatment under the Act comes from federal law. *Id.* at 7. The Defendants say that "[t]he federal H-2A visa program requires unauthorized aliens to go through a rigorous eligibility process if they wish to work in the same jobs that are available to domestic workers.

The Act simply codifies the federal government's disparate treatment between these unauthorized alien workers and domestic workers." *Id.*

The Defendants explain that "an employer seeking to hire unauthorized aliens must satisfy various threshold eligibility requirements that are not applicable when hiring a domestic worker." *Id.* at 8. Thus, the Defendants submit that "[c]onsistent with the distinction created by the federal government between unauthorized aliens and domestic workers, the State of Maine has made a threshold determination that there are sufficient eligible domestic truck drivers available to transport forest products that are harvested from a Maine landowner's land to another location in Maine and that the use of H-2A visa workers for that activity would undermine the health of the logging industry in Maine." *Id.* at 8. The Defendants thus argue "[t]he Act . . . applies the exact same threshold eligibility requirements to a single position available at logging companies . . . to ensure that domestic log truck drivers who are able, willing, and qualified are not unfairly denied such work." *Id.*

Next, the Defendants contend that the Act is likely to survive strict scrutiny "because it is narrowly tailored to serve the compelling State interest of regulating employment, protecting workers from discrimination, and ensuring the vibrance of its logging industry." *Id.* at 8-9. The Defendants put forth that the "governmental interest in minimizing discrimination against domestic workers in favor of unauthorized aliens through the abuse of the H-2A visa program is certainly within the State's traditional police power." *Id.* at 9 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012)). Additionally, the Defendants submit that the Act

15

is narrowly tailored "because it addresses just a single position within a single industry" and is therefore "laser-focused on . . . local problems." *Id.* at 9-10.

Finally, the Defendants again dispute the Plaintiffs' reliance on *Dandamudi*, first because the decision is not binding on this Court, but also because the state in that case conceded having no compelling justification for its law, whereas here "Maine has offered a compelling interest in protecting domestic workers from discrimination, preventing unemployment, and protecting the vibrance of Maine's logging industry." *Id.* at 10.

As to irreparable harm, the Defendants assert that the Plaintiffs' potential "loss of employment does not constitute an 'irreparable harm' since such a loss is typically rectified with non-equitable relief" and subject employers can simply hire "U.S. resident worker[s]." *Id.* at 17.  Second, the Defendants argue that there is no irreparable harm if the Act does not apply to H-2A visas that were issued prior to the Act's effective date and that any harm in the future is purely speculative.  *Id*.

Finally, in weighing the public interest, the Defendants contend that "[t]he Act seeks to protect domestic workers and the Maine logging industry" and that the "creation and preservation of jobs are especially important during high times of unemployment, such as now." *Id.* at 18.  Additionally, the Defendants submit that there is no harm to Pepin Lumber or MFPC because they can employ domestic workers to drive their trucks, and there is no harm to Mr. Audet because, while he may lose his current job, there is no guarantee that he would even be eligible for

another H-2A visa in the future or that the specific job he was approved for will still be available.  *Id.* at 18.

### C.     The Plaintiffs' Reply

In reply, the Plaintiffs point to four "threshold defects" in the Defendants' opposition.  *Pls.' Reply* at 2.  First, the Plaintiffs dispute the Defendants' use of the terms "unauthorized alien" and "domestic worker" which the Plaintiffs say are not based on existing federal immigration law.  *Id.*  The Plaintiffs contend that this "taxonomy" "leave[s] no room . . . for nonimmigrant aliens, like holders of H-2A visas, who may work in the United States but who maintain their permanent residence in their country of origin."  *Id.*

Second, the Plaintiffs assert that the attachments to the Defendants' opposition—a press release and PowerPoint presentation—are inadmissible hearsay and the Court should note the absence of any supporting testimony from state officials about the Act.  *Id.* at 2-3.

Third, the Plaintiffs dispute the Defendants' reliance on Senate President Jackson's testimony because they "cite[] no authority for the proposition that the testimony of a single legislator at a public hearing may serve as a 'legislative finding' or as a factual material on which the Court can rely for any purpose other than divining legislative intent."  *Id.* at 3.  The Plaintiffs contend that "courts may give weight to *enacted* statements of fact and declarations of policy, [but] the Act contains neither."  *Id.* (emphasis in original).  Thus while the testimony "reveals the legislative intent behind the Act—indeed, the testimony confirms the Act's impermissible

purposes otherwise apparent from its plain language—that testimony does not consist of factual evidence on which this Court may rely for any other purpose." *Id.*

Fourth, the Plaintiffs note that "the State appears to suggest Plaintiffs lack standing because the Act applies only to those who may seek or receive H-2A visas after the Act's effective date." *Id.* at 4. The Plaintiffs argue that the Act, by its "plain language," applies "regardless of when [a] person sought or received the visa," which gives Mr. Audet standing to sue. *Id.* Additionally, Pepin Lumber and MFPC members have historically relied on H-2A visas, which gives them standing to challenge the Act. *Id.*

As to the Defendants' equal protection arguments, the Plaintiffs assert that "the Act's prohibition on H-2A visa recipients hauling forest products in Maine serves as a prohibition on *lawful*, not *unlawful* aliens," *id.* at 5 (emphasis in original), and therefore the Act "does not 'follow the federal direction' of the treatment of aliens." *Id.* (quoting *Defs.' Opp'n* at 7). The Plaintiffs contend that "it is not within the State's authority to determine the need for H-2A workers in Maine, a power clearly claimed by the federal government." *Id.* (citing *Toll*, 485 U.S. at 10). The Plaintiffs also dispute the State's alleged "interest in preventing unauthorized aliens from depriving citizens and permanent resident aliens of jobs" because the Act does not regulate "unauthorized aliens" but instead "prohibits lawfully present H-2A recipients" from working as federally authorized logging truck drivers. *Id.* at 6 (internal quotation marks omitted). The Plaintiffs further argue that even if the State does have an interest in protecting Maine workers from discrimination in times of high

18

unemployment, the Act is not narrowly tailored "because it forever bans the use of any H-2A workers as log truck drivers regardless of employment conditions in Maine." *Id.* The Plaintiffs point out that this "blanket ban" is unlike the DOL's design for the H-2A visa program, which is to make a case-by-case determination of whether there are domestic workers available for a particular job. *Id.* at 7.

The Plaintiffs dispute the applicability of the presumption against preemption here because "the Act is not a neutral labor or forestry law that applies generally across all workers in Maine's forestry industry, such as a minimum wage requirement or a safety standard . . . [but] instead . . . is 'laser-focused' on the use of immigrant labor in Maine," *id.* at 8 (quoting *Defs.' Opp'n* at 10), which is not a "traditional sphere[] of [state] authority." *Id.* The Plaintiffs further contest the Defendants' argument that "the H-2A program contemplates the possibility of states eliminating the use of H-2A workers within their jurisdiction" because of the "Automatic Revocation Provision" because "[t]he State cites no authority for the proposition that Congress intended for this provision to serve as an invitation to states to *cause* job loss through nullification of the H-2A program." *Id.* at 8-9 (emphasis in original). The Plaintiffs oppose the Defendant's assertion that the Act creates a new program using the same eligibility criteria found in the INA, reasoning that "it lays a flat ban on the use of H-2A workers as log truck drivers, with no role for administrative decision-making or any kind of case-by-case assessment of individualized circumstances, such as takes place under the H-2A program." *Id.* at 9.

Lastly, the Plaintiffs question the Defendants' claim that Mr. Audet can be "compensated through non-equitable relief" because they are not aware of any way that Mr. Audet "can obtain retrospective monetary damages for economic losses caused by the Act." *Id.*

## IV.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).   A judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18.   Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

V.      DISCUSSION

A.      Likelihood of Success on the Merits

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is "the most important part of the preliminary injunction assessment") (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007)).   The Court analyzes the merits of the Plaintiffs' challenges to Public Law 280 and concludes the law is preempted by Federal law and violates the Equal Protection Clause.

1.      Federal Preemption

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect," which can result in laws in "conflict or at cross-purposes." *Arizona v. United States*, 567 U.S. 387, 398-99 (2012).   "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Id.* at 399 (quoting U.S. CONST. art. VI, cl. 2).   "State law must . . . give way to federal law in [three] . . . circumstances": (1) when Congress "enact[s] a statute containing an express pre-emption provision;" (2) when "Congress, acting within its proper authority" determined that conduct in a particular field "must be regulated by its exclusive governance" (field preemption); and (3) when state

laws conflict with federal law such that "compliance with federal and state regulations is a physical impossibility" (impossibility preemption) or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress" (obstacle preemption), which is collectively termed "conflict preemption." *Id.* (internal quotation marks omitted).

"According to the Supreme Court, '[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Hartford Enters., Inc. v. Coty*, 529 F. Supp. 2d 95, 102 (D. Me. 2008) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). The burden is on the plaintiff to establish preemption. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 150 (2020).

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' [the court] start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 13 (2013); *Arizona*, 567 U.S. at 400 (both quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The presumption against preemption applies to both express and implied preemption analyses. *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 322, 431 (D. Me. 2017) (citing *Medtronic*, 518 U.S. at 485). However, "the presumption against preemption does not apply where Congress's

intent is apparent from the statutory text, context, and purpose." *Spectrum Northeast LLC v. Frey*, 496 F. Supp. 3d 507, 512 (D. Me. 2020) (citing *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1197-98 & n.3 (2017)); *see also Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 74 (1st Cir. 1999) ("The Supreme Court has repeatedly cited *Hines* [*v. Davidowitz*, 312 U.S. 52 (1941)] for the proposition that an 'Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws in the same subject" (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981))).

Here, the Plaintiffs argue conflict preemption. *Pls.' Mot.* at 11. Thus, the Court first addresses whether the Act stands as an obstacle to the accomplishment and execution of the INA.

> **a.    The Purpose and Scope of Federal Immigration Authority, the Immigration and Nationality Act, and the Federal H-2A Visa Program.**

The Supreme Court has long recognized that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, including the "regulation of aliens within our borders." *Toll v. Moreno*, 458 U.S. 1, 10 (1982). Federal immigration authority "rests, in part, on the National Government's constitutional power 'to establish a[] uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394-95 (internal citations omitted); *see also* U.S. CONST. art. I, § 8, cl. 4; *Toll* at 458 U.S. at 10. The Supreme Court has articulated the underlying justification for this power, namely that "[i]t is fundamental that foreign countries concerned about the status, safety, and security

of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395 (citing *Chy Lung v. Freeman*, 92 U.S. 275, 279-280 (1876); THE FEDERALIST NO. 3, 39 (C. Rossiter ed. 2003) (J. Jay))).  To this end, the Supreme Court "has reaffirmed that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Id.* (alterations in *Arizona*) (quoting *Hines*, 312 U.S. at 64).

The federal government's immigration authority permits it to "determine[e] what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." *Toll*, 458 U.S. at 11.  This power inherently limits that of the states:

> Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states.  *State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.*

*Id.* (emphasis in original) (quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)); *see also id.* at 13 ("[S]tate regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress").  Against this broad guiding principle, the Supreme Court also wrote: "[t]o be sure, when Congress has

done nothing more than permit a class of aliens to enter the country temporarily, the proper application of the principle is likely to be a matter of some dispute." *Id.* at 13.

Finally, the "the mere fact that a state law implicates the interests of persons who are the subject of federal regulation, even with respect to immigration, does not alone provide a basis for inferring that the federal regulatory scheme was intended to preempt a field that encompasses such a state law, at least when it concerns a matter of such quintessentially local concern as employment." *Capron*, 944 F.3d at 24 (citing *De Canas v. Bica*, 424 U.S. 351, 360 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404).[8]

In 1952 Congress enacted the Immigration and Nationality Act (INA), which is a "comprehensive and complete code covering all aspects of admission of aliens[9] to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Toll*, 458 U.S. at 13-14 (quoting *Elkins v. Moreno*, 435 U.S. 647, 664 (1978)); *see Kansas v. Garcia*, 140 S. Ct. 791, 797 (2020) ("The . . . INA . . . sets out the 'terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country'" (quoting *Chamber of Comm. of U.S. of Am. v. Whiting*, 563 U.S. 582, 587 (2011))). The INA "recognizes two basic classes of aliens, immigrant and nonimmigrant." *Toll*, 458 U.S. at 13.

---

[8]  Decided in 1976 prior to the 1986 enactment of the Immigration Reform and Control Act (IRCA), *De Canas* held that "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State," 424 U.S. at 356. The IRCA now governs employment of illegal aliens. *See Kansas v. Garcia*, 140 S. Ct. 791, 797-98 (2020); *Whiting*, 563 at 588-89 (discussing the IRCA). Although *De Canas'* central holding is no longer good law because of the enactment of the IRCA, courts continue to cite it for its principles on immigration law and preemption more generally. *See e.g., Whiting*, 563 U.S. at 587-88; *Capron*, 944 F.3d at 22-23.

[9]  An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

To begin, the INA defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).  The INA defines "immigrant" as "every alien" except aliens who fall within statutorily defined classes of "nonimmigrant aliens." *Id.* § 1101(a)(15).  The classes of nonimmigrant aliens include ambassadors, aliens entering the United States for study or training, and, as relevant here, individuals who live in a foreign country and come to the United States to perform "agricultural labor". *Id.* § 1105(a)(15)(H)(ii).  By contrast, an "immigrant," as opposed to "nonimmigrant," alien is any non-citizen who does not fall into any of the "nonimmigrant" categories in § 1101(a)(15) and, for example, includes persons who enter the United States as refugees or asylees. *See, e.g.*, *id.* §§ 1101(a)(42), 1157 (admission of refugees), 1158 (asylum).

Within the broad category of "nonimmigrant aliens" are several classes, each distinguishable based on the type of visa granted and the alien's purpose for entering the United States.[10] *See generally* 8 U.S.C. § 1101(a)(15) (defining different classes of nonimmigrant alien visas).  One such nonimmigrant alien subcategory is for individuals who have been lawfully granted H-2A visas by the United States, permitting them to enter the country for a set period of time to engage in agricultural labor or services. *Id.* § 1101(a)(15)(H)(ii)(a).

Specifically, the INA defines a H-2A visa holder as an "alien having a residence in a foreign country which he has no intention of abandoning who is coming

---

[10]     For example, F-1 visas are granted to aliens who enter the United States to study; B-1 visas for business; and B-2 visas for tourism.  U.S. Department of State—Bureau of Consular Affairs, *Directory of Visa Categories*, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/all-visa-categories.html (last visited Feb. 16, 2022).

temporarily to the United States to . . . perform agricultural labor or services." *Id.* The Department of Homeland Security has stated that the "purpose of the [H-2A program] is to provide agricultural employers with an orderly and timely flow of legal workers, thereby decreasing their reliance on unauthorized workers, while protecting the rights of laborers." 73 Fed. Reg. 76891, 76891 (Dec. 18, 2008) (codified at 8 C.F.R. pts. 214, 215, 274) (summary of the purpose of the final rule)[11].

Obtaining an H-2A visa is a complex two-step process.  The application process is initiated not by the potential holder of the H-2A visa, but by the employer seeking to hire the potential H-2A visa holders for agricultural work.  *See* 8 U.S.C. § 1188(a)(1)(A)-(B); 8 C.F.R. § 214.2(h)(5)(i)(A), (D)*;* 20 C.F.R. § 655.130.  First, the employer must apply for a "temporary agricultural labor certification" (labor certification) from the Department of Labor (DOL)[12] certifying that:

---

[11]      "Although the preamble has been in disuse for many years there is a modern tendency to use it or a policy section to explain the basis for legislative action on the theory that it will assist to establish the constitutionality of the act.  The preamble is useful in constitutional litigation where it is alleged that the act . . . conflicts with specific constitutional prohibitions."  1A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 20:4 (7th ed. 2020).

[12]      The labor certification itself is a four-part process.  *See* U.S. Dep't of Labor, *H-2A Temporary Certification for Agriculture Workers*, https://flag.dol.gov/programs/H-2A (last visited Feb. 16, 2022) (*FLAG DOL*).  First, the employer must submit a "job order" with the State Workforce Agency (SWA) serving the area of intended employment.  20 C.F.R. § 655.121(a)(1).  The job order contains the "material terms and conditions of employment," and must be submitted to the state agency "no more than 75 calendar days and no fewer than 60 calendar days before the date of need."  *Id.* § 655.103.

The job order must also be processed as a "clearance order" through the Agricultural Recruitment System (ARS).  *Id.* §§ 651.10, 655.121(a)(3).  Before issuing a clearance order, the SWA must find that the employer has "attempted and [has] not been able to obtain sufficient workers within the local labor market" or there is an "anticipate[d] . . . shortage of local workers."  *Id.* § 653.501(a)(1)-(2).

Second, the employer must file an H-2A application with the Chicago National Processing Center no less than 45 calendar days prior to the work start date.  *FLAG DOL.*

Third, if the SWA determines that the job order is compliant, the SWA and employer must advertise the job order in the intended area of employment for the recruitment period.  20 C.F.R. § 655.121(c)-(d); *FLAG DOL.*

     (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition,[13] and

     (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.[14]

8 U.S.C. § 1188(a)(1)(A)-(B); *see also* 20 C.F.R. § 655.130 (certification application filing requirements).   During the certification process the DOL will also "test[] whether [the] employment qualifies as temporary or seasonal."   8 C.F.R. § 214.2(h)(5)(iv)(B); *see also* 20 C.F.R. § 655.122.

     Upon receipt of a labor certification from the DOL, the employer must next file a petition with the United States Citizenship and Immigration Services (USCIS) showing "that the proposed employment qualifies as a basis for H-2A status."   8 C.F.R. § 214.2(h)(5)(i)(A), (D).   In this petition the employer must demonstrate that "each beneficiary will be employed in accordance with the terms and conditions of the certification"[15];  that the employment is of a "temporary or seasonal nature," which

---

[13]    An employer may not give preferential treatment to aliens and "must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers.  Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H-2A workers."  20 C.F.R. § 655.122(a).

[14]    Federal regulations break this two-step process down further into five components: (1) "whether employment is as an agricultural worker"; (2) "whether [the employment] is open to U.S. workers"; (3) whether "qualified U.S. workers are available"; (4) any "adverse impact of employment of a qualified alien"; and (5) "whether employment conditions, including housing, meet applicable requirements."  8 C.F.R. § 214.2 (h)(5)(ii).

[15]    Employers must meet certain wage requirements, provide housing and transportation, and guarantee employment for at least 75% of the work period specified in the employment contract, known as the "three-fourths guarantee."  20 C.F.R. § 655.122 (contents of job offers); U.S. Dep't of Labor, *H-2A: Temporary Agricultural Employment of Foreign Workers*, https://www.dol.gov/agencies/whd/agriculture/h2a (last visited Feb. 16, 2022); U.S. Dep't of Labor, *Fact Sheet #26: Section H-2A of the Immigration and Nationality Act (INA)*, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs26.pdf (last visited Feb. 16, 2022).  An employer may be subject to civil monetary penalties if they violate terms of the work contract, 29 C.F.R. § 502.19(c), which include wages, hours, and working conditions and other conditions in Subpart B of 29 C.F.R. § 655.  *Id.* § 502.10.  t

is usually satisfied by a DOL seasonality finding during the initial certification process; that the beneficiary of the H-2A visa meets the minimum qualifications of the job and is able to fully perform the duties of that position; and that the employer consents to certain notification requirements. *Id.* § 214.2(h)(5)(iii), (iv)-(vi).

Once granted, the H-2A visa is tied to specific employment, meaning that "[a]n alien with this status may be employed only by the [employer] through whom the status was obtained." *Id.* § 274a.12(b)(9). An alien's H-2A visa may be revoked upon finding that "[t]he beneficiary is no longer employed by the petitioner in the capacity specified in the petition, or if the beneficiary is no longer receiving training as specified in the petition." *Id.* § 214.2(h)(11)(iii)(A)(1).

### b.   Whether Public Law 280 is Preempted by the Immigration and Nationality Act

In light of the federal government's comprehensive role in immigration and naturalization, the Court must determine whether Public Law 280 stands as an obstacle to the implementation and enforcement of the H-2A visa program as created by the INA.

To begin, the parties disagree on whether the Act should be defined as an immigration and naturalization regulation, an area governed by the federal government, or an industry or employment regulation, an area traditionally governed by the states. As this District has noted, "[i]n order to decide whether Congress intended to occupy the field, it is important, first, to define the field." *Ouellette v. Mills*, 91 F. Supp. 3d 1, 8 (D. Me. 2015); *see also id.* at 8 n.7 (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009)). The Plaintiffs frame

29

the Act as regulating immigration, *Pls.' Reply* at 8 ("[T]he Act is not a neutral labor or forestry law that applies generally across all workers in Maine's forestry industry"), while the Defendants argue the Act regulates the logging industry, which is traditionally a state function. *Defs.' Opp'n* at 11-12 ("The Act regulates an area historically within the province of the states: enacting legislation to ensure the vibrance of local economies and to protect all authorized domestic workers, regardless of immigration status, from discrimination").

Although the Defendants are correct that regulation of the logging industry and employment in Maine is a traditional state function, *see e.g.*, 12 M.R.S. § 8869 (forest harvest regulations), the Court disagrees that the Act falls within the scope of a traditional employment or industry regulation.[16]  Given that the Act effectively grants the state of Maine the superseding authority to revoke H-2A visas for certain individuals and supplant the DOL's labor certification, as discussed below, the Act at its core regulates immigration, an inherently federal area, rather than industry or employment.  The Court does not treat Public Law 280 as a traditional state law in its conflict preemption analysis.

---

[16]     The Defendants point to three laws as examples of Maine's authority to regulate the logging industry: 26 M.R.S. § 871, which prohibits the hiring of illegal aliens in the logging industry, § 872, which requires proof of equipment ownership for logging companies hiring foreign workers, and § 873, which sets forth procedures for recruiting qualified workers in the logging industry.  However, these laws do not change the Court's calculus.  The IRCA's legislative history states that "the Committee does not intend to preempt licensing or 'fitness to do business laws,' such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens."  H.R. Rep. 99-682, 1986 U.S.C.C.A.N. 5649, 5662.  All three laws the Defendants cite fall within this articulated "exception" that the federal government left to the states.  First, section 871 addresses work in the logging industry by illegal immigrants, which Congress did not intend the IRCA to preempt.  Second, sections 872 and 873 both fall squarely within the type of "fitness to do business" laws that states have traditionally adopted and do not impact admittance of aliens to the United States.

Under the theory of conflict preemption courts have held that a state law may be preempted if the goals of that state law are in direct conflict with Congressional objectives, as articulated by a federal statute.  *See Natsios*, 181 F.3d at 75-76; *Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977).  Here, the Court finds Public Law 280 preempted by the INA because it strikes a different balance between the dual goals of protecting employers and protecting the local workforce in a way that inherently conflicts with congressional intent.

The First Circuit's most recent analysis of this difficult area is found in its 2019 decision *Capron v. Office of the Attorney General of Massachusetts*, which provides helpful guidance.  In *Capron*, the First Circuit addressed whether the INA and the federal Au Pair Program preempted Commonwealth of Massachusetts statutes controlling wage and hour laws for nonimmigrant aliens holding J-1 visas.  944 F.3d at 20.  The challenge to the Massachusetts laws was based only on implied preemption and therefore the First Circuit addressed only field and conflict preemption.  *Id.* at 21.

The *Capron* Court reviewed the Supreme Court's decision in *De Canas v. Bica*, noting that the Supreme Court applied a presumption against preemption and, once applied, the *De Canas* Court concluded that "'[t]he comprehensiveness' of the INA 'without more[,]' was not sufficient to establish the 'clear and manifest' congressional intent to oust state law that is required to overcome the presumption against preemption."  *Id.* at 23 (alterations in *Capron*) (quoting *De Canas*, 424 U.S. at 357, 359).  The *Capron* Court noted that in *De Canas* the "state laws at issue were not

deciding 'who should or should not be admitted into the country and the conditions under which a legal entrant may remain,' as they merely concerned the power to employ undocumented aliens already in the country." *Id.* at 22 (quoting *De Canas*, 424 U.S. at 355). The First Circuit also pointed out that the Supreme Court had explained that the "state law measures -- which regulated employment -- concerned a quintessentially local area of regulation." *Id.* (citing *De Canas*, 424 U.S. at 356-57).

The First Circuit did not resolve whether the presumption against preemption should apply. Instead, the *Capron* Court observed that even if it were to conclude that the presumption against field preemption applied, the plaintiffs would still bear the burden of proving that the Au Pair Program preempts the relevant field. *Id.* at 24. The First Circuit pointed out that the INA and Au Pair Program applied to sponsoring organizations and the Massachusetts statutes applied to the host families of the au pairs. *Id.* Next, the First Circuit discounted the impact of the Massachusetts law on the "federal government's power over foreign affairs, both with respect to immigration and foreign relations." *Id.* at 24-25. Significantly, the *Capron* Court noted that "these state law measures do not purport -- as the ones at issue in *De Canas* did . . . -- to preclude the foreign nationals affected by them from being employed. They merely establish the wage and hour rights that the foreign nationals affected by the federal regulatory scheme enjoy if they are employed." *Id.* at 25. The First Circuit concluded that field preemption did not apply. *Id.* at 26.

The *Capron* Court next turned to conflict preemption, observing that the plaintiffs were pressing only obstacle preemption. *Id.* Here, the First Circuit wrote

that "[t]he notion that underlies obstacle preemption is that the federal government would want a federal measure to be preemptive of any state law that 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of that federal measure." *Id.* (quoting *Hines*, 312 U.S. at 67). The First Circuit said that the plaintiffs in *Capron* must show that "there is a conflict between the state law measures and the Au Pair Program by showing that the former would frustrate the purposes and objectives of the latter." *Id.* at 28. To do so, the plaintiffs in *Capron* had to "identify affirmative evidence that Congress or the D[epartment o[f] S[tate] had a ceiling-setting -- and thus obstacle-preemption-creating -- intent." *Id.* (citing *Arizona*, 567 U.S. at 400, 414). In *Capron*, the First Circuit examined evidence of congressional intent and found it lacking. *Id.* at 29-33. Nor did the First Circuit find convincing the plaintiffs' recitation of statutory and regulatory history. *Id.* at 33-39. In rejecting the plaintiffs' preemption argument, the First Circuit concluded that the federal laws and regulations did not create a "ceiling-setting character" and the appellate court found "neither the text, nor the regulatory history, nor even past practice demonstrates that they have []." *Id.* at 44.[17]

The First Circuit has not spoken on the preemptive effect of the INA on state laws impacting non-immigrant H-2A visas but has analyzed the preemptive effect of the federal government's foreign relations power on a state law banning trade with

---

[17]     On February 10, 2022, the Court of Appeals for the First Circuit issued *Consumer Data Indus. Ass'n v. Frey*, No. 20-2064, __F.4th__, 2022 U.S. App. LEXIS 3682 (1st Cir. Feb. 10, 2022), addressing preemption. The *Consumer Data* Court explained the contours of express preemption in that case. *Id.* at *7 ("In this setting, our inquiry reduces to whether the Amendments are swept into the maw of FCRA preemption, and in particular, that of express preemption"). Here, the Court has resolved this issue before it on obstacle, not express, preemption and therefore *Consumer Data* is relevant only as it reinforces how nuanced preemption analyses must be.

then-named Burma. *See Natsios*, 181 F.3d at 44. In *Natsios*, the First Circuit affirmed the district court's holding that the state law, which restricted Massachusetts and its agencies from purchasing goods or services from companies doing business with Burma, was preempted because the state law "veer[ed] from the carefully balanced path that Congress ha[d] constructed" in its attempts to "steer a middle path." *Id.* at 45, 76. The First Circuit went on to explain that Congress' goal to improve human rights was a foreign relations policy and in creating the policy, Congress had "considered various mechanisms to accomplish and balance this country's various interests and goals and chose a set of carefully calibrated tools." *Id.* The First Circuit compared the "careful calibration reflect[ing] the judgment of the Congress and the President" as to the "most effective means to improve human rights conditions in Burma while safeguarding other national interests" with the state's choice of "a blunt instrument to further only a single goal, making judgments different from and contrary to the judgments made by Congress and the President." *Id.*

The Third Circuit applied a similar "goal balancing analysis" in *Rogers v. Larson*, 563 F.2d 617 (3d Cir. 1977), a case factually similar to the one before this Court. There, the Third Circuit held that a Virgin Islands law requiring the termination of nonimmigrant H-2A visa workers for replacement with qualified resident workers was preempted by the INA[18] because it stood "as an obstacle to the

---

[18]     The version of the INA in effect when the Third Circuit decided *Rogers* combined the H-2A and H-2B programs, *see La. Forestry Ass'n, Inc. v. Solis*, 814 F. Supp. 2d 655, 663 (W.D. La. 2011), however the H-2A visa requirements at the time were the same. *See Rogers*, 563 F.2d at 622-24. The enactment

accomplishment and execution of the full purpose and objectives of the INA and [was], therefore, invalid under the Supremacy Clause." *Id.* at 619 n.1, 626.  The Third Circuit concluded that the INA and the Virgin Islands law "share[d] some common purposes" but were nonetheless "in direct conflict." *Id.* at 626.  The Third Circuit recognized that both laws sought to "assure an adequate labor force on the one hand and to protect the jobs of citizens on the other" before concluding that "[a]ny statutory scheme with these two purposes must inevitably strike a balance between the two goals" of protecting citizen-workers by restricting employment by nonimmigrant aliens and protecting an ample workforce by eliminating all restrictions on nonimmigrant alien entry. *Id.; see also Hernandez Flecha v. Quiros*, 567 F.2d 1154, 1156 (1st Cir. 1977) (agreeing with the Third Circuit's articulation of the dual goals of the INA's H-2A program); *Digilab, Inc. v. Sec'y of Labor*, 495 F.2d 323, 326 (1st Cir. 1974) (describing the dual "praiseworthy Congressional legislative objectives").

It was in the different striking of the balance of these two goals that the Third Circuit found a conflict between the INA and the Virgin Islands' law. *Rogers*, 563 F.2d at 626.  The Third Circuit described the following considerations undergirding the INA: continuity of the workforce; an employer's expectation that a nonimmigrant worker will not be terminated until the date specified on the DOL's certification; prevention of disruptive turnovers in employment; incentives for aliens to come to the United States for employment; and certainty to those with H-2A visas that they will

---

of the IRCA in 1986 subdivided the INA into the current H-2A and H-2B programs. Cong. Research Serv., *H-2A and H-2B Temporary Worker Visas: Policy and Related Issues* at 2-3 (2020), https://sgp.fas.org/crs/homesec/R44849.pdf.

have employment for a period of at least one year. *Id.* In contrast, the Third Circuit described the Virgin Islands' law as "balanc[ing] . . . in the direction of protection of citizen-workers" by allowing "[t]he Government of the Virgin Islands [to] . . . shorten the period of stay granted to an alien worker by the United States by causing him to fail to comply with a condition of his stay under federal law: continued employment." *Id.*

The same tension between federal goals and state goals in *Capron*, *Natsios*, and *Rogers* is present in this case. The purpose of the H-2A visa program, as articulated by the Department of Homeland Security and recognized by the Third Circuit, is to "provide agricultural employers with an orderly and timely flow of legal workers, thereby decreasing their reliance on unauthorized workers, while protecting the rights of laborers." 73 Fed. Reg. 76891, 76891; *see also Rogers*, 563 F.2d at 626. The DOL's labor certification analysis further reflects this delicate balance between employers and domestic workers by requiring the Secretary to consider both an employer's need to fill a particular position and the impact of foreign workers on the citizen workforce. *See* 8 U.S.C. § 1188(a)(1)(A)-(B). Conversely, Public Law 280 is intended to reduce competition with Canadian truckers and improve access to jobs for Maine workers. *See Jackson Test.* at 1-2; *Decl. of Nolan L. Reichl*, Attach. 1, *Ex. A*, at 4-5 (*BDN Article*). As in *Rogers* and *Natsios*, and unlike in *Capron*, the Act ignores Congress' balancing to favor state employment interests. Namely, the Act promotes local workers' interests without considering individual employers' needs

and is similarly a "blunt instrument" to further a single goal. *See Natsios*, 181 F.3d at 76.

While the H-2A visa program and Public Law 280 share the goal of protecting local workers, "the fact that state and federal legislation share common goals, either in whole or in part, is not sufficient to preclude a finding of preemption." *Id.* at 77 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)). "The crucial inquiry is whether a state law impedes the federal effort." *Id.* Because the goals of Public Law 280 conflict with the goals and design of the H-2A visa program, the state law impedes the federal government's ability to issue H-2A visas to employers hiring logging truck drivers who meet DOL and USCIS H-2A petition requirements. *See LeClerc v. Webb*, 419 F.3d 405, 424-25 (5th Cir. 2005) (implying that a law barring F-1 or J-1 nonimmigrant visa holders from sitting for the Louisiana bar exam was not preempted in part because the law did not undercut the underlying goal of the F-1 and J-1 student visas, which is to allow for the matriculation of nonimmigrant students). As stated by the First Circuit in *Natsios*, "[w]here . . . the federal government has acted in an area of unique federal concern and has crafted a balanced, tailored approach to an issue, and the state law threatens to upset that balance, the state law is preempted." *Natsios*, 151 F.3d at 77.

The Act further stands as an obstacle to the INA because the Act (1) directly prohibits what the INA allows, thereby rendering the federal government's grant of the H-2A visa "advisory" by letting the state of Maine make a final determination as to the permissibility of certain H-2A visas and; (2) supplants the DOL's labor

certification with the Maine Legislature's own determination regarding employers' need for foreign workers.

Two out-of-circuit cases are instructive in the Court's analysis.  In *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012), the Second Circuit struck down a New York law prohibiting nonimmigrant workers with H-1B visas[19] or TN statuses[20] from working as licensed pharmacists.[21]  *Id.* at 69-70.  The Second Circuit determined that federal law preempted the New York law because the New York law effectively made the federal laws creating H-B1 and TN visa status "advisory."  *Id.* at 80.  The Second Circuit concluded the New York law would frustrate the federal scheme because the federal government could give eligible nonimmigrants permission to enter the United States for certain purposes while the New York law would simultaneously allow the state to bar an entire class of nonimmigrants from engaging in certain occupations.  *Id.*  The Second Circuit further explained that it was within Congress' authority to grant entry to professionally qualified nonimmigrants and the New York law created an obstacle to this authority by "making immigration status a professional qualification."  *Id.*

---

[19]     Individuals holding H-1B visas are considered "nonimmigrant aliens" and may come "temporarily to the United States to perform services . . . in a specialty occupation."  8 U.S.C. § 1101(a)(15)(H)(i)(b).

[20]     "'TN' status is a temporary worker status created by federal law pursuant to the North American Free Trade Agreement ("NAFTA").  NAFTA permits 'a citizen of Canada or Mexico who seeks temporary entry as a business person to engage in business activities at a professional level' to enter the United States and work here pursuant to the requirements of the TN status."  *Dandamudi*, 686 F.3d at 70 (quoting 8 C.F.R. § 214.6(a))

[21]     The Second Circuit reversed on equal protection grounds, but also conducted a preemption analysis this Court finds instructive.

Conversely, in *LeClerc v. Webb*, the Fifth Circuit held that a state law prohibiting nonimmigrant aliens holding J-1 student visas, or H-1 temporary worker visas, from taking the Louisiana state bar exam was not preempted by the INA. 419 F.3d at 410-11. The Fifth Circuit concluded that the Louisiana law did not bar "what Congress expressly permits by federal statute" in part because the state law did not inhibit the purpose of J-1 student visas or hinder compliance with visa requirements. *Id.* at 424-25. The Fifth Circuit similarly concluded that the state law did not interfere with the INA because an H-B1 visa holder could still comply with their visa even if they did not take the bar exam because professional licensure was only one of four ways a person can prove eligibility for a temporary work visa, and the statute contemplated compliant employment on a H-B1 visa without professional licensure. *Id.* at 425 & n.56*; cf. Capron*, 944 F.3d at 25 (holding than a state law governing wages and hours of au pairs was not preempted because the "state law measures [did] not purport . . . to preclude the foreign nationals affected by them from being employed").

Here, Public Law 280 is further preempted because it makes federal law advisory. As in *Dandamudi* and unlike in *LeClerc*, Public Law 280 would make it impossible for certain H-2A visa holders to comply with their federal visa requirements.

First, in doing so, as in *Dandamudi*, Public Law 280 renders certain federally granted H-2A visas advisory by permitting the state of Maine to make the final determination as to visa eligibility for logging truck drivers. As discussed above, each

H-2A visa is tied to a specific job with a specific employer.  The application process for the H-2A visa is conducted by the employer, rather than the employee, *see* 8 U.S.C. § 1188(a)(1)(A)-(B), and the required DOL certification is specific to that employer's particular job opening, as demonstrated by the requirement that the employer provide detailed evidence that it first advertised the job to U.S. citizens and permanent residents for a specific duration, pursuant to certain geographic requirements.  *See* 8 C.F.R. § 214.2(H)(5)(ii); 20 C.F.R. § 655.130.  Not only may "[a]n alien in this status [only] be employed . . . by the [employer] through whom the status was obtained," 8 C.F.R. § 274a.12(b)(9), but if the federal government finds "[t]he beneficiary is no longer employed by the petitioner in the capacity specified in the petition," the federal government may revoke the H-2A visa.  *Id.* § 214.2(h)(11)(iii)(A)(1).

The interdependent relationship between visa status and employment status is critical for defining the scope of the Act and why it presents an obstacle to the INA. Through the H-2A visa petition process, the DOL may certify the request for a foreign worker as a truck driver in the logging industry and USCIS may then grant a H-2A visa for an employee in that specific job.  However, the state of Maine, under the authority of Public Law 280, can then prohibit these particular H-2A visa holders from working in the position specifically authorized by their visa.  Thus, under 8 C.F.R. § 214.2(h)(11)(iii)(A)(1) the federal government would then give notice to the employer that it intended to revoke the workers' H-2A visas for failing to work in the

position for which they were granted the visa.[22]  *Id.* ("Grounds for revocation.  The director <u>shall</u> send to the petitioner a notice of intent to revoke the petition in relevant part if he or she finds that: (1) the beneficiary is no longer employed by the petitioner in the capacity specified in the petition, or if the beneficiary is no longer receiving training as specified in the petition") (emphasis supplied).

As delineated in § 214.2(h)(11)(iii)(A)(1), this would be true even if the employer were to then offer the H-2A visa holder a different job in the logging industry.  Because H-2A visas are position-specific, the visa is non-transferable—even between different jobs and even by the same employer.  *See* 8 C.F.R. § 214.2(h)(11)(iii)(A)(1); 20 C.F.R. § 274a.12(b)(9).  Prohibiting employment of logging truck drivers holding H-2A visas effectively forces those individuals to "fail to comply with a condition of his stay under federal law: continued employment."  *Rogers*, 563 F.2d at 626; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (holding that "the Executive branch [exercised its discretion when it] determined that deferred action recipients—including DACA recipients—are ordinarily authorized to work in the United States" and that the state law at issue is preempted because it "obstructs many DACA recipients' ability to work in Arizona").

---

[22]    The Court is further unpersuaded by the Defendants' argument as to the "Automatic Revocation Provision."  *Defs.' Opp'n* at 13-14.  Defendants assert that the Act is consistent with federal law because "[t]he H-2A visa program . . . specifically contemplates an early expiration of the visa if the job an alien was hired to do is no longer available to them.  Thus, federal law is consistent with the Act because the federal Automatic Revocation Provision is triggered when the position that [Mr. Audet] was hired to do is no longer available as a matter of state law."  That an H-2A visa holder is able to comply with both federal law and the Act in termination of the H-2A visa upon application of the Act ignores that the Act displaces federal authority to determine immigration status in the first place.  Moreover, the First Circuit has rejected the argument that a law is not preempted when it is possible to comply with both state and federal law because "[a]ny concurrent state power that may exist is restricted to the narrowest limits."  *Natsios*, 181 F.3d at 77.

By excluding H-2A visa holders from the definition of employees eligible to serve as point-to-point logging truck drivers, the Act effectively gives Maine the final say as to the immigration status of a certain subset of employees—nonimmigrant truck drivers in the logging industry holding H-2A visas—who are permitted under federal law to remain in the United States solely for that purpose. *Cf. Capron*, 944 F.3d at 25 ("[T]hese state law measures do not purport -- as the ones at issue in *De Canas* did . . . -- to preclude the foreign nationals affected by them from being employed"); *Hartford Enters., Inc. v. Coty*, 529 F. Supp. 2d 95, 101 (D. Me. 2008) ("The Maine Workers' Compensation Act in no way determines admission into the United States or the conditions for remaining in this country; therefore, it is not a 'regulation of immigration'").

The authority granted by Public Law 280 allows Maine to supersede the decisions of the federal government and make its own determination as to whether a specific individual may enter the United States to be employed within the country runs contrary to the federal government's vested authority to "determine[e] what aliens shall be admitted to the United States [and] the period they may remain." *Toll*, 458 U.S. at 11; *cf Capron* 944 F.3d at 25 (concluding that state laws "merely establish[ing] the wage and hour rights that the foreign nationals affected by the federal regulatory scheme enjoy if employed" was not preempted because the state laws did not affect visa or employment status). As noted in *Dandamundi*, a state law that effectively revokes a lawfully granted visa renders federal law "advisory" because it permits "the states to decide whether nonimmigrants (as a class, not as

individuals) should be permitted to [hold certain occupations]."   686 F.3d at 80 (quoting *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 600 (S.D.N.Y. 2010)); *see also* 8 U.S.C. § 1155 (granting the Secretary of Homeland Security the authority to revoke visa status petitions); *Hartford Enters, Inc.*, 529 F. Supp. 2d at 101.

Moreover, as Public Law 280 effectively reverses the federal government's grant of H-2A visas, the Act "proscrib[es] . . . what Congress expressly permits by federal statute," which the *LeClerc* Court considered a vital distinction.  *LeClerc*, 419 F.3d at 424-25 ("Section 3(B) does not succumb to the *Toll* infirmity of proscribing by state law what Congress expressly permits by federal statute . . . [because] Section 3(b) does not prevent the legal matriculation of nonimmigrant alien students admitted to the United States on F-1 or J-1 visas . . . [and is] in fact, consistent with provisions that prohibit student visa holders from obtaining gainful employment . . . .").

Second, Public Law 280 is distinguishable from the law in *LeClerc* because it leaves open no alternative ways for an H-2A visa holder employed as a logging truck driver to comply with their visa.  Because H-2A visas are tied not just to an employer, but to a specific job, termination of the underlying job (in this case driving a logging truck point-to-point in Maine) necessarily means termination of the H-2A visa itself. Unlike the H-1B visa holders in *LeClerc* who could continue to work and live in the United States under the same visa with alternative employment, nonimmigrants granted entrance to the United States under a H-2A visa for the purpose of truck driving for a Maine logging operation may not stay in the United States if their

employment is terminated, other than to seek a new, separate H-2A visa.  *See* 8 C.F.R. § 214.2(h)(5)(viii)(B) (stating that H-2A workers may remain in the United States for 30 days beyond the expiration of the approved H-2A petition to prepare for departure or to seek an extension or change of nonimmigrant status).  Thus, the Act stands as an obstacle to the implementation of the H-2A visa program because it allows the state of Maine to effectively reverse certain federal government visa determinations and expressly prohibit the visa that the INA expressly authorized.

The Defendants submit that the Act does not pose an obstacle to the INA because the Act imposes on employers the same "rigorous [two-part] analysis" conducted by the DOL in the H-2A program.  *Defs.' Opp'n* at 16.   To this end, Defendants say Maine has determined that "(A) there are ample eligible domestic workers to [work as logging truck drivers point-to-point within the state of Maine] and (B) employing aliens via the H-2A visa program would adversely affect Maine's logging industry in particular, and as a result of fewer jobs and increased unemployment, its economy in general."  *Id.* at 15.

Although Public Law 280 may implicitly adopt the same criteria used by the DOL, the INA expressly reserves labor certification decision-making for the DOL, on a yearly, case-by-case basis.  *See* 8 U.S.C. § 1188(a)(1)(A)-(B) (stating that the Secretary of Labor is responsible for the H-2A certification analysis).  The INA and accompanying regulations therefore leave no room for states to enact their own state-based INAs and make their own determinations of an employer's eligibility for a certificate of labor.  Moreover, the state's determination of eligibility via Public Law

280 is at odds with the INA's design, because Public Law 280 makes a one-time, blanket determination that there are sufficient eligible domestic workers and that the H-2A program harms Maine's logging industry which is substantially broader and more restrictive than the federal government's yearly, case-by-case determinations as part of the H-2A visa program.

Finally, the exception articulated in *Toll*, that a state law may not preempt the INA when Congress "has done nothing more than permit a class of aliens to enter the country temporarily," does not apply here.  458 U.S. at 13.  While H-2A visa holders may enter the United States for a defined period, their visas go beyond mere entry. Congress went a step further when it authorized the DOL to determine an alien's employment eligibility, finding that an employer's hiring of foreign workers is necessary when an employer is unable to hire domestic workers, and conditioning an alien's entrance to the United States on continued employment in a specific position in a specific geographic area.  *See Dandamudi*, 686 F.3d at 81 (holding that the H-B1 visa program goes beyond merely allowing a nonimmigrant to enter the United States temporarily because the visa also grants nonimmigrant aliens permission to work in certain occupations); *see also Toll*, 458 U.S. at 14 (holding that a state's refusal to grant G-4 nonimmigrant alien visa holders in-state tuition solely on account of their status was an additional burden not contemplated by Congress in admitting the visa holders into the United States because Congress explicitly did not prohibit G-4 holders from acquiring domicile).

Moreover, Public Law 280 "imposes additional burdens not contemplated by Congress," *Toll*, 458 U.S. at 13, as it singles out a specific job within a specific industry as no longer eligible for H-2A visas which goes beyond what Congress initially contemplated in the INA. *See id.* at 14 ("In light of Congress' explicit decision not to bar G-4 aliens from acquiring domicile, the State's decision to deny 'in-state' status to G-4 aliens, *solely* on account of the G-4 alien's federal immigration status, surely amounts to an ancillary 'burden not contemplated by Congress' in admitting these aliens to the United States") (emphasis in *Toll*); *cf. Graham v. Richardson*, 403 U.S. 365, 378-79 (1971) (concluding that a state's withholding of welfare benefits from lawfully admitted resident aliens who later become indigent "impose[s] auxiliary burdens upon the entrance or residence of aliens" not contemplated by Congress).

### c.   Summary

The Court concludes that federal law preempts Public Law 280 because the goals of the Act conflict with the INA, the Act allows the state of Maine to make final H-2A visa decisions, and the Act permits Maine to make its own determination of employers' need for foreign workers in contradiction to the requirements of the federal H-2A program.

### 2.   Equal Protection[23]

'The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides, "[n]o State shall . . . deny to any person within its

---

[23]   Before addressing equal protection, the Court considered the doctrine of constitutional avoidance, which advises federal courts "not to reach constitutional issues where alternative grounds for resolution are available." *Vaqueria Tres Monjitas, Inc. v. Pagan*, 748 F.3d 44, 52 (1st Cir. 2014)

jurisdiction the equal protection of the laws." [24] *Bruns v. Mayhew*, 931 F. Supp. 2d 260, 266 (D. Me. 2013), *aff'd and remanded*, 750 F.3d 61 (1st Cir. 2014) (quoting U.S. CONST. amend. XIV, § 1). "Because 'person' denotes lawfully admitted resident aliens and citizens of the United States, both noncitizens and citizens are entitled to 'equal protection of the laws of the State in which they reside.'" *Id.* (quoting *Graham*, 403 U.S. at 371). "In order to establish an equal protection violation, a plaintiff must show state-imposed disparate treatment compared with others similarly situated 'in all relevant respects.'" *Bruns*, 750 F.3d at 65 (internal quotation marks omitted) (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001)). "In determining whether two groups are similarly situated" the "somewhat imprecise test [is] 'whether a prudent person, looking objectively . . . would think them roughly equivalent.'" *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). Thus, "the proponent of the equal protection violation must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or

(quoting *Am. Civil Liberties Union v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013)). "The cannon of constitutional avoidance binds both [the First Circuit] and the district court." *Id.* (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936); *Sony BMF Music Entm't v. Tenenbaum*, 660 F.3d 487, 508 (1st Cir. 2011)). Even though the Court's preemption ruling could resolve the case, the issue of irreparable harm is clearer if there is a constitutional infringement. Accordingly, although cognizant of constitutional avoidance, the Court determined that the constitutional issue could not be avoided without running the risk that the First Circuit would resolve the irreparable harm issue in favor of the Defendants and be required to remand the matter for resolution of the equal protection issue.

[24]     The Maine Constitution states, "No person . . . [shall] be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof." ME. CONST. art. I, § 6-A. "This provision is coextensive with the Fourteenth Amendment to the United States Constitution." *State v. Bennett*, 2015 ME 46, ¶ 17, 114 A.3d 994, 1000. Accordingly, the Court's analysis of Plaintiffs' state and federal equal protection claims are identical.

mitigating circumstances as would render the comparison inutile." *Id.* at 66 (quoting *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007)).

### a.    Applicable Standard of Scrutiny and the *Plyler* "Uniform Rule" Doctrine.

To properly evaluate the constitutionality of Public Law 280, the Court must first determine the applicable standard of constitutional scrutiny.  "Alienage, like race and nationality, constitutes a suspect classification under the Fourteenth Amendment." *Id.*  "Because '[a]liens as a class are a prime example of a discrete and insular minority,' a state's alienage-based classifications inherently raise concerns of invidious discrimination and are therefore generally subject to strict judicial scrutiny." *Id.* (alteration in *Bruns*) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)).  Although "states traditionally enjoy broad power to regulate economics and social welfare, even the otherwise 'valid interest in preserving the fiscal integrity of [state] programs' is generally insufficient grounds for a state-imposed burden on alienage to survive an equal protection challenge." *Id.* (quoting *Graham*, 403 U.S. at 374-75).

"The calculus is markedly different for *congressional* acts distinguishing on the basis of alienage, evaluated under the Due Process Clause of the Fifth Amendment." *Id.* (emphasis in *Bruns*).  "Because Congress acts with plenary authority when it legislates the rights and benefits to be afforded aliens present in this country . . . congressional disparate treatment of aliens is presumed to rest on national immigration policy rather than invidious discrimination." *Id.* (citing *Mathews v. Díaz*, 426 U.S. 67, 79-85 (1976)).

48

Although "[n]o state may independently exercise [federal power to conduct foreign policy, control access to the United States, and determine who may become a citizen] . . . if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982). Where the exception, which has been termed the "uniform rule" doctrine, *see, e.g.,* Jenny-Brooke Condon, *The Preempting of Equal Protection for Immigrants?*, 73 WASH. & LEE. L. REV. 77, 127 (2016), applies, state action that distinguishes among people on the basis of alienage may be subject to rational basis review rather than strict scrutiny because the state is "following federal direction." *See, e.g.*, *Sudomir v. McMahon*, 767 F.2d 1456, 1465 (9th Cir. 1985) ("The defendants respond by asserting that it is not necessary to make such a showing [under strict scrutiny] because California has merely adopted a federal classification which is subject only to the rational basis standard of review"); *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085, 1091 (N.Y. 2001) ("If the rule were uniform, each State would carry out the same policy under the mandate of Congress—the only body with authority to set immigration policy"); Condon, 73 WASH. & LEE. L. REV. at 127.

The Supreme Court has not defined what constitutes a "uniform rule" and courts have explored this doctrine nearly exclusively in the context of state benefit laws where Congress expressly delegated some implementation authority under the benefit law to the states. *See, e.g.*, *Korab v. Fink*, 797 F.3d 572, 581, 583-84 (9th Cir. 2014) (holding that rational basis review applied because Congress "(clearly)

expressed its will regarding a matter related to aliens" when it passed the Welfare Reform Act giving limited discretion to the states to determine alien qualification for Medicaid benefits); *Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004) (holding that a state program was due judicial deference because Congress had expressed a uniform, national policy that the states could adopt as evidenced by the fact that the Medicaid program was administered and partially funded by states). To apply the appropriate level of scrutiny to the Act, the Court must first determine whether the INA creates a uniform doctrine that the state of Maine is simply implementing through its enactment of Public Law 280.

The Defendants submit that the Plaintiffs' equal protection claim fails because Public Law 280 is consistent with the federal standard of treatment for aliens as proscribed in *Plyler*, 457 U.S. at 219 n.19 (1982). *Defs.' Opp'n* at 6-7. The Defendants argue that because the Act "simply codifies the federal government's disparate treatment between [] unauthorized alien workers and domestic workers," the law is consistent with federal standards and the Court should therefore apply rational basis as it would to a federal statute distinguishing on the basis of alienage. *Id.* at 7. The Plaintiffs urge the Court to apply strict scrutiny because the state law distinguishes among people based on alienage, and thus "inherently raise[s] concerns of invidious discrimination and [is] therefore generally subject to strict judicial scrutiny." *Pls.' Mot.* at 15 (quoting *Bruns*, 750 F.3d at 66).

The Court rejects the Defendants' argument. First, as noted previously, courts have nearly exclusively applied the uniform rule doctrine in the context of Medicaid,

which is "a Gordian knot of federal and state legislation" and thus a classic example of cooperative federalism.[25]   *See Bruns*, 750 F.3d at 66.   Here, the INA is notably different.   Unlike Medicaid and other social welfare programs, Congress has not delegated to states authority under the INA to regulate admittance to the United States.   *See, e.g.*, *Korab* 797 F.3d at 581; *Soskin*, 353 F.3d at 1255.   While State Workforce Agencies do play a role in the initial labor certification determination for H-2A visas, *see* 20 C.F.R. §§ 655.103, 655.121(a)(1), there is nothing in the INA or related federal regulations to suggest Congress delegated to states the discretion to craft their own visa eligibility requirements.   On the contrary, the federal regulations set forth unform criteria that all SWAs must apply in their respective regions.   *See* 20 C.F.R. § 655.130.

The Defendants contend that Public Law 280 simply follows federal direction and "codifies the federal government's disparate treatment between [] unauthorized alien workers and domestic workers" by applying "the exact same threshold eligibility requirements to a single position" and making its own "threshold determination that there are sufficient eligible domestic truck drivers available to transport forest products." *Defs.' Opp'n* at 7-8.

The Defendants' argument is flawed, however, as it casts the issue of "uniformity" too broadly.   Even if Public Law 280 is read to apply the same two-part

---

[25]     Under cooperative federalism, Congress delegates certain legislative powers, creating "uniformity [that] does not require the elimination of any differences among the States." *Korab*, 797 F.3d at 581 (quoting *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982)).   Moreover, the federal government has typically delegated such authority in the context of social welfare programs over which "states traditionally enjoy broad power." *Bruns*, 750 F.3d at 66.

labor certification analysis under federal law, it remains that Congress has not delegated discretion to states to create their own criteria for visa applicants and instead requires compliance with the requirements of the DOL and USCIS.  There is nothing in the INA to suggest that Congress intended the H-2A visa program to be broadly uniform and yet vary from state to state.  Indeed, such a conclusion would run contrary to the federal government's broad power over immigration as undergirded by the principle that "the United States must be able to confer and communicate on this subject [as] one national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395.  Accordingly, the Court concludes that Public Law 208 does not follow federal direction and thus does not invoke the uniform rule doctrine.

In the absence of the uniform rule doctrine, the Court must determine whether rational basis or strict scrutiny applies to the Act.  While courts agree that aliens are a prime example of a "discrete and insular minority," *see Carolene Prods. Co.*, 304 U.S. at 152-53 n.4, circuit courts are split on the breadth of the term "alien."  Some courts have held that strict scrutiny applies only to laws discriminating against lawful permanent resident (LPR) aliens and not against nonimmigrant aliens, *see, e.g.*, *LeClerc*, 419 F.3d at 415-22, while other courts have held that strict scrutiny applies to all laws discriminating against lawfully admitted aliens regardless of their LPR or nonimmigrant alien status.  *See, e.g.*, *Dandamudi*, 686 F.3d at 72-79.  The Supreme Court has not spoken on this issue but has articulated several parameters for the Court's analysis.

### i.     Supreme Court Precedent

In *Graham v. Richardson*, the Supreme Court struck down an Arizona law requiring a fifteen-year residency term for welfare eligibility and a Pennsylvania law requiring that welfare recipients be United States citizens, because both laws "create[d] two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country." 403 U.S. at 367-68, 371. The *Graham* plaintiffs had LPR status. *Id.* at 368-70. The Court applied strict scrutiny, noting that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny [because] [a]liens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Id.* at 372 (citing *Carolene Prods. Co.*, 304 U.S. at 152-53, n.4).

The *Graham* Court admitted that it had, on occasion, upheld statutes permitting states to distinguish between aliens and citizens but narrowed this exception to circumstances where the "laws were necessary to protect special interests of the State or its citizens." *Id.* at 372 ("[T]he power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits") (quoting *Takahashi* 334 U.S. at 420)). The Supreme Court concluded that neither the Arizona nor Pennsylvania laws could withstand strict scrutiny because a state has no "'special public interest' in favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits" because "[t]he Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of

legal privileges with all citizens under nondiscriminatory laws." *Id.* at 372-74 (citing *Takahashi*, 334 U.S. at 420).

In coming to this conclusion, the Court compared aliens and citizens, reasoning "[a]liens like citizens pay taxes and may be called into the armed forces. Unlike [] short-term residents[26] . . . aliens may live within a state for many years, work in the state and contribute to the economic growth of the state." *Id.* at 376 (internal quotation marks omitted). The Court found further footing for the application of strict scrutiny in supremacy concepts. Relying again on *Takahashi*, the Court held that conditioning welfare benefits solely on alienage "conflict[s] with . . . overriding national policies . . . [and states] 'can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization, and residence of aliens in the United States.'" *Id.* at 337-38 (quoting *Takahashi*, 334 U.S. at 419).

The Supreme Court similarly applied strict scrutiny in *In re Griffiths*, 413 U.S. 717, 722 (1973), to strike down a state law that limited bar admission to citizens in a lawsuit brought by an alien with LPR status. *Id.* at 718. Following *Graham*, the *Griffiths* Court reasoned that "[r]esident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society," and thus, "[i]t is appropriate that a State bear a heavy burden when it deprives them of employment opportunities." *Id.* at 722. The Supreme Court concluded that the law was not narrowly tailored and that exclusion of aliens from

---

[26]     The Supreme Court did not define what it meant by "short-term residents."

bar membership was not necessary to ensure the professional standards of the state bar. *Id.* at 722-23, 725.

In *Nyquist v. Mauclet*, 432 U.S. 1 (1977), the Supreme Court explained that a law differentiating persons based on alienage is subject to "close judicial scrutiny" if the law "is directed at aliens and [] only aliens are harmed by it." *Id.* at 9 (striking down a state law prohibiting nonresident aliens who have not expressed intent to become citizens from receiving financial assistance for higher education). The Court rejected appellants' argument that a law is only subject to strict scrutiny if it "distinguishes between citizens and aliens vel non," stating that "[t]he fact that the statute is not an absolute bar [against all aliens] does not mean that it does not discriminate against the class." *Id.*

Finally, in *Plyler v. Doe*, the Supreme Court applied heightened rational basis review to a law excluding children who were not legally admitted into the country from free public education. 457 U.S. at 205. The Court determined that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country [is] in violation of federal law." *Id.* at 223. However, the *Plyler* Court ultimately applied heightened rational basis because the class of persons at issue, "innocent" undocumented alien children, were "not accountable for their disabling status." *Id.* at 223-24.

Taken together, these cases stand for several principles: (1) lawfully admitted aliens are protected by the Equal Protection Clause of the United States Constitution; (2) unlawful aliens are subject to a different level of scrutiny than lawfully admitted

aliens; (3) the Court uses the terminology "aliens" and "resident aliens" but has not expressly limited strict scrutiny to LPRs nor defined "resident alien"; (4) the Court looks to key hallmarks of participation in society in determining the level of review; and (5) a law need not discriminate against all lawfully admitted aliens to be a violation of Equal Protection and thus discrimination against a single subgroup of lawfully admitted aliens may be unconstitutional.

### ii.    The Circuit Court Split

The First Circuit has not spoken on whether state laws discriminating against lawfully admitted nonimmigrant aliens, such as H-2A visa holders, are subject to strict scrutiny or rational basis review.  The other circuit courts that have addressed this issue are split.

Circuits applying rational basis have looked primarily to the "transient" nature of nonimmigrant alien visas, holding that the shorter duration of a nonimmigrant alien's stay, in comparison to that of an LPR alien, undercuts the justification for the application of strict scrutiny.  In *LeClerc*, the Fifth Circuit applied rational basis to uphold a state law prohibiting nonimmigrant aliens from taking the Louisiana state bar.  419 F.3d at 410.  The *LeClerc* Court interpreted Supreme Court precedent as only applying strict scrutiny to "permanent resident aliens" and differentiated aliens with LPR status as more akin to citizens compared to other nonimmigrant aliens.  *Id.* at 415.  In distinguishing between LPRs and nonimmigrant aliens, the Fifth Circuit concluded that LPRs are vulnerable because they cannot participate in the political process but nonimmigrant aliens do not need such protections because "they have no intention of abandoning their native citizenship" and "enter with no enforceable claim

56

to establishing permanent residence or ties here." *Id.* at 417. In essence, a nonimmigrant alien's "lack of legal capacity . . . is tied to their temporary connection to this country" and they therefore "do not warrant *Carolene Products* status." *Id.* at 417-18.

The *LeClerc* Court distinguished *Graham*, *Nyquist*, and *Griffiths*, holding that the state laws in those cases "warranted close judicial scrutiny because they took positions seemingly inconsistent with the congressional determination to admit the alien to permanent residence." *Id.* at 417 (emphasis omitted) (quoting *Foley v. Connelie*, 435 U.S. 291, 295 (1978)); *see also Folely*, 435 U.S. at 295 ("These exclusions struck at the noncitizens' ability to exist in the community"). The *LeClerc* Court further distinguished *Griffiths*, which also involved a law restricting bar admissions, on the ground that the aliens at issue were permanent resident aliens rather than nonimmigrant aliens and the law at issue in *Griffiths* prohibited all aliens from practicing law, rather than just a subset of aliens. *Id.* at 415.

In coming to its conclusion the *LeClerc* Court identified key differences between resident aliens and nonimmigrant aliens: "[n]onimmigrant aliens' status is far more constricted than that of resident aliens," as nonimmigrant aliens are admitted for a short duration, do not seek permanent residence in the United States, may not serve in the military, are subject to strict employment restrictions and different tax treatment, and may be denied welfare benefits. 419 F.3d at 419. Finally, the Fifth Circuit reasoned that the "federally prescribed" transient nature of nonimmigrant aliens meant that the state had a legitimate interest in passing a law

to protect its citizens from nonimmigrant alien attorneys who may leave the country at any time. *Id.* at 421-22.[27]

Conversely, circuit courts applying strict scrutiny have discounted "transience" as a relevant factor in determining the level of scrutiny, instead emphasizing the vulnerability of nonimmigrant aliens. In *Dandamudi v. Tisch* the Second Circuit applied strict scrutiny, reasoning that, since *Graham*, the Supreme Court has continuously reasserted its holding that aliens should not be singled out absent narrow tailoring for a compelling state interest. 686 F.3d at 73 (collecting cases). The *Dandamudi* Court explained that the Supreme Court has "never distinguished between classes of *legal* resident aliens" and has "never held that lawfully admitted aliens are outside of *Graham's* protection." *Id.* at 74 (emphasis in *Dandamudi*). The *Dandamudi* Court further rejected the holdings in *LeClerc* and *LULAC* because those courts "narrow[ed] *Graham's* holding to reach only those aliens who are indistinguishable from citizens" which the *Dandamudi* Court believed to "misconstrue[] both law and fact." *Id.* at 75.

The *Dandamudi* Court identified three reasons for not following the Fifth and Sixth Circuits. First, the Second Circuit concluded that the language in *Graham* relied on by the *LeClerc* and *LULAC* Courts—that, much like citizens, aliens pay taxes and may be called into the armed forces—was not intended by the Supreme

---

[27]     The Sixth Circuit came to a similar conclusion in *League of United Latin American Citizens v. Bredesen (LULAC)*, upholding a state law prohibiting nonimmigrant aliens from obtaining state-issued driver's licenses.  500 F.3d 523, 536-37 (2007).  The decision relied almost exclusively on *LeClerc*. *See id.* at 533.  The *LULAC* court adopted the reasoning of the lower court and differentiated *Nyquist*, concluding that unlike the law in *Nyquist*, the classification at issue was "in no way inconsistent with federal law, but rather mirror[ed] it." *Id.*

Court to serve as a "litmus test for determining whether a particular group of aliens is a suspect class" because "[a] group of aliens need not be identical or even virtually identical to citizens to be fully protected by the Fourteenth Amendment." *Id.* at 76. "Nothing in the Supreme Court's precedent counsels us to 'judicially craft[] a subset of aliens, scaled by how [we] perceive the aliens' proximity to citizenship." *Id.* (quoting *LeClerc*, 444 F.3d 428, 429 (5th Cir. 2006) (Higginbotham, J., dissenting from the denial of reh'g en banc)).

Second, the Second Circuit stated that lawfully admitted aliens are a "discrete and insular minority" because of their "'impotence in the political process[,] . . . the long history of invidious discrimination against them' . . . [and] their limited role in the political process." *Id.* at 77 (quoting *LeClerc*, 419 F.3d at 428-29 (Stewart, J., dissenting)). The *Dandamudi* Court characterized nonimmigrant aliens as "likely [] more powerless and vulnerable to state predations—more discrete and insular" than LPR aliens, thus warranting additional protections. *Id.* (quoting *Constitutional Law—Equal Protection—Fifth Circuit Holds that Louisiana Can Prevent Nonimmigrant Aliens from Sitting for the Bar*, 119 HARV. L. REV. 669, 674 (2005)). The Second Circuit further concluded that nonimmigrants do pay taxes just as citizens and LPRs do, and dismissed as irrelevant the contention that limited work permission under a nonimmigrant visa was grounds for distinguishing nonimmigrant aliens from LPRs and citizens because "the state [sought] to prohibit aliens from engaging in the very occupation for which the federal government granted the alien permission to enter the United States." *Id.*

Having discarded all other distinctions between LPRs and nonimmigrants, the Second Circuit agreed with the district court that the level of scrutiny "boil[s] down to one potentially important difference—nonimmigrants have not yet obtained permission to reside in the United States permanently." *Id.* at 78 (quoting *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 592 (S.D.N.Y. 2010)). The *Dandamudi* Court thus rejected the core of the *LeClerc* Court's argument that the transient nature of nonimmigrant status creates legitimate state concerns that justify rational basis. *Id.* The Second Circuit noted that many of the nonimmigrant aliens at issue, professionals who often remained in the United States for more than six years, ultimately apply for permanent residence. *Id.* Thus, the non-permanent nature of their entry into the United States was immaterial. *Id.*

In light of the Supreme Court's well-established principle that alienage[28] is a suspect class and in absence of Supreme Court precedent that this rule is reserved solely for LPRs and not lawfully-admitted nonimmigrant aliens, the Court follows the Second Circuit, rather than the Fifth and Sixth Circuits. While the Supreme Court has never expressly stated that a law discriminating against nonimmigrant aliens requires strict scrutiny, existing precedent points to its application here. The Court therefore applies strict scrutiny.

First, the Supreme Court has framed its rules on alienage broadly, consistently referring to "aliens" as a general category without distinguishing among various

---

[28]    Public Law 280 expressly excludes H-2A visa holders from its definition of "resident of the United States" and therefore distinguishes between H-2A visa holders and all other persons, citizens, and other visa or LPR holders alike. It is therefore appropriate for the Court to view Public Law 280 as discriminating on the basis of alienage.

types of aliens.  In *Graham*, the Supreme Court crafted its rule on alienage broadly despite being faced with a law that discriminated specifically against LPRs.  *See e.g.*, *Graham*, 403 U.S. at 372 (describing "aliens" broadly as a protected class).  Although the Supreme Court later used the term "resident alien" in *Griffiths*, *see* 413 U.S. at 722, "resident alien" is not an immigration category defined by the INA.  The INA defines "residence" as any "place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(33); *see also* Adam Bryan Wall, *Justice for All?: The Equal Protection Clause and Its Not-So-Equal Application to Legal Aliens*, 84 Tul. L. Rev. 759, 775 (2010) (citing Gerald Rosberg, *Discrimination Against the "Nonresident" Alien*, 44 U. Pitt. L. Rev. 399, 401 (1983)) (discussing the circuit courts' interpretations of "resident alien" and who the Supreme Court meant to include in the "alien suspect class").  Moreover, an "alien," as defined by the INA, is "any person not a citizen or national of the United States," encompassing both nonimmigrant aliens and LPRs.  8 U.S.C. § 1101(a)(3).  The Supreme Court's broad usage of "alien," and the INA's definitions of "resident" and "alien", support the conclusion that strict scrutiny is not cabined to LPR aliens.  The Court therefore sees no reason to impose its own distinctions within the broader category of "alien."

Second, the Supreme Court has at various points erected a dichotomy, not between LPR aliens and nonimmigrant aliens, both lawful, but between lawfully and unlawfully admitted aliens.  For example, the *Graham* Court reiterated its previous conclusion in *Takahashi* that "aliens lawfully within this country have a right to enter

and abide in any State in the Union 'on an equality of legal privileges with all citizens under nondiscriminatory laws.'" *Graham*, 403 U.S. at 378 (quoting *Takahashi*, 334 U.S. at 420). The *Graham* Court did not distinguish among different types of legal aliens, so long as the aliens were *legally* within the United States. The Supreme Court further solidified this distinction in *Plyler* when it confirmed that laws discriminating against aliens not legally admitted to the United States are subject only to rational basis review. 457 U.S. at 223. The *Graham/Plyler* distinction between lawfully and unlawfully admitted aliens supports the application of strict scrutiny in this case, as H-2A visa holders are *lawfully* admitted aliens. Given the Supreme Court's distinction between lawful and unlawful aliens, it would be incongruous to subject lawfully admitted nonimmigrant aliens to rational basis, just as the Court would an unlawful alien.

Third, *LeClerc* and *LULAC* distinguished *Graham, Nyquist,* and *Griffiths* because the state laws at issue in those cases were inconsistent with a congressional determination. *See LeClerc*, 419 F.3d at 417, 424 ("[T]here is no incongruity between what Congress permits of student and temporary worker nonimmigrants and what Section 3(B) prevents"); *LULAC*, 500 F.3d at 533. While the *LeClerc* and *LULAC* Courts concluded that the state laws before them were consistent with a congressional determination and therefore distinguishable from Supreme Court precedent, the same is not true here. As previously discussed, Public Law 280 is inconsistent with the congressional determination that certain persons meeting specific criteria may lawfully enter the United States for employment, including

62

employment as a logging truck driver if the specified criteria are met. In this respect, the law is inconsistent with a congressional determination, as it "str[ikes] at the heart of [certain H-2A visa holders'] ability to exist in the community," *Foley*, 435 U.S. at 295. This case, unlike *LeClerc* and *LULAC*, is therefore consistent with *Graham*, *Nyquist*, and *Griffiths* because Public Law 280 expressly makes illegal what Congress has permitted.

Fourth, the Court disagrees that nonimmigrant aliens do not need the same protections as LPRs because they are in the United States temporarily and have no intention of abandoning citizenship in their native countries. *See LeClerc*, 419 F.3d at 417. In light of the Supreme Court's reaffirmance "that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country,'" *Arizona*, 567 U.S. at 395 (quoting *Hines*, 312 U.S. at 64), it is incongruous that some nonimmigrant aliens be granted certain protections and others not, simply based on their desire to retain citizenship in their country of origin and the duration of their stay in the United States. The United States has an interest in protecting the rights of all lawfully admitted aliens, regardless of the length of their stay and willingness to return home. Nor do the Defendants point to any authority suggesting otherwise.

Moreover, the Court agrees with the Second Circuit that nonimmigrant aliens may, in fact, be more vulnerable than LPR aliens. *See Dandamudi*, 686 F.3d at 77. H-2A visa holders and other nonimmigrant aliens cannot vote or participate in the political process, are otherwise "subject to disadvantages not shared by the remainder

of the community," and may be unfamiliar with the language and culture.  *Hampton v. Wong*, 426 U.S. 88, 101-02 (1976).  The H-2A visa's short duration and its agricultural nature may render H-2A visa holders particularly vulnerable as they may be less likely to speak English and may not be as well educated, compared to someone who enters, for example, on a B-1 visa who has specialized training.

Fifth, applying the same indicia from *Graham* and *Griffiths*, H-2A nonimmigrant visa holders share many of the characteristics identified by the Supreme Court in cases warranting strict scrutiny.  Like other nonimmigrant visa holders and LPRs, H-2A visa holders pay federal income taxes, although they are not required to file Social Security or Medicare taxes.  IRS, *Foreign Agricultural Workers on H-2A Visas*,  https://www.irs.gov/individuals/international-taxpayers/foreign-agricultural-workers (last visited Feb. 17, 2022).  H-2A visa holders also support the economy, despite the limited duration of their stay, by filling jobs that domestic workers are unwilling or unable to take.  *See Graham*, 403 U.S. 635 at 376; *Dandamudi*, 686 F.3d at 78. Because the H-2A program fills needed positions that would otherwise remain open, the transient nature of individual workers does not undermine the value of H-2A visa holders' contributions to the economy.  In designing the program, Congress contemplated that the limited duration of the H-2A visa was in the best interest of employers and United States workers.

### b.    Applying Strict Scrutiny

Ultimately, strict scrutiny applies; however, the Defendants do not meet their burden of showing that the state has a compelling government interest that is narrowly tailored.  The Defendants argue that state government has a compelling

interest "in minimizing discrimination against domestic workers in favor of unauthorized aliens through the abuse of the H-2A visa program," which it submits "is certainly within the State's traditional police power."[29] *Defs.' Opp'n* at 9.

The Court disagrees. While state labor and industry laws fall within the traditional state police power, Public Law 280 does not fall within the four corners of a traditional labor law because it fundamentally impacts immigration, as discussed in the Court's preemption analysis. As Public Law 280 effectively gives the state of Maine the ability to revoke H-2A visas for certain individuals and supplant the DOL's labor certification, the Act raises the issue of immigration. The Court thus is not convinced by the Defendants' reliance on *Hartford Enterprises, Inc. v. Cody*, which concerned a broadly applicable workers' compensation statute that the court concluded "in no way determine[d] admission to the United States or conditions for remaining in this country." As discussed previously, Public Law 280 ultimately determines admission to the United States and the conditions for remaining in the

---

[29]     While the Defendants' brief does not expressly address the issue of "cabotage," it was discussed at length in Senate President Jackson's testimony in support of the Act, and therefore seems to be an underlying purpose of the law. However, any argument that H-2A visa holders are in fact *unauthorized* because they are in violation of the cabotage rules fails. *See Jackson Test.* at 1-2, 6-12. As described by the Sixth Circuit, "Canadian truck drivers [cannot] 'cabotage,' i.e., haul freight point-to-point within the United States, as 'B-1 business visitors' under the INA." *Robert v. Reno*, 25 F. App'x 378, 380 (6th Cir. 2002). Notably, cabotage rules only apply to those with B-1 visas and *not* to those with H-2A visas. *See e.g.*, Austin T. Fragomen, Jr., Careen Shannon, et al., 1 IMMIGR. L. & BUS. § 3:9 (2d ed.) (2021 update) ("The legacy INS clarified that cabotage (carrying goods picked up at one point in the United States and dropping them off at another point in the United States), is not a "necessary incident" of international commerce and, therefore, is not a permissible B-1 Activity"); INS Insp. Field Manual 21.13, Entry of Commercial Truck Drivers (Revised 8/2/05; CBP 10-05) (identifying guiding principles for "determining whether a trucking movement is a permissible B-1 activity versus an activity constituting cabotage or unlawful employment in the United States"). By definition, H-2A visa holders are lawfully employed in the United States and are not prohibited from "cabotage" because they are not B-1 visa holders. To the extent that Public Law 280 seeks to prohibit so called cabotage by H-2A visa holders, the state has no compelling interest because the cabotage rules only apply to B-1 visa holders, not H-2A visa holders.

country by prohibiting logging truck drivers from being employed in the position they have been authorized to fill by the federal government.   Furthermore, unlike the workers' compensation statute in *Hartford Enterprises*, Public Law 280 applies to a mere subset of laborers and is therefore not a broadly applicable labor law.

To the extent that the Defendants argue that Maine workers are being discriminated against and logging companies are hiring H-2A visa holders instead of able and willing Maine workers, the Defendants have not demonstrated that this is, in fact, an issue of concern for the state of Maine.   The Defendants attach a PowerPoint from the Maine Department of Labor explaining workforce conditions in Maine through September 2021.[30]  *See Dec. of Sarah E. Coleman, AAG* (ECF No. 24) (*Coleman Dec.*), Attach. 2, *Workforce Conditions Through September 2021*.   The document explains that "job openings are historically high, quits are up, and wages are surging in a very competitive environment for attracting and retaining labor" but that "the number of hires hasn't changed much as labor force participation remains suppressed." *Id.* at 6-7.  This does not support the Defendants' assertion that "there are ample eligible domestic workers . . . and . . . employing aliens via the H-2A visa program would adversely affect Maine's logging industry [and overall economy] . . .

---

[30]     The Plaintiffs argue that the PowerPoint and press release evidence submitted by the Defendants in opposition to the motion for preliminary injunction are inadmissible hearsay.   *Pls.' Reply* at 2-3.  However, "hearsay materials are often received in preliminary injunction proceedings [and] [t]he dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding."   *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986).  It is true that not all hearsay is admissible in a motion for preliminary injunction. *See, e.g., United States v. 8,440,190.00 in U.S. Currency*, 719 F.3d 49, 65 n.17 (1st Cir. 2013). Nevertheless, the Court concludes that the Defendants' evidence is appropriate in this context as part of its argument that the state of Maine has a compelling interest in enacting Public Law 280.

as a result of fewer jobs." *Id.* at 15.  The Defendants' own evidence shows that there are more jobs in Maine than workers willing to take them, which tends to support the Plaintiffs' argument that the logging industry has too few Maine workers to support their operations.  Furthermore, the Defendants' economic data summarize workforce conditions across Maine without differentiating among sectors or industries.  It is therefore inappropriate for the Court to extrapolate the conclusion that this data is representative of the logging industry and working conditions of the logging industry in all parts of the state.

The Defendants further point to a 2009 article[31] from the Maine DOL explaining that the Commissioner for the DOL had "documented a number of significant concerns that lead the State to believe that there is a substantial adverse impact upon Maine workers in the [logging] sector." *Coleman Dec.*, Attach. 1, *Logging Firms Cited for Employment Practices*, at 1.  The article further identifies that the Obama administration had "announced new rules that call[ed] for stronger protections for U.S. workers and tougher penalties for violations" and references enforcement actions under a new law in Maine requiring equipment proof of ownership.  However, this article does not speak to the fundamental problem the Defendants identify and, in the Court's view, does not justify the enactment of Public Law 280.  *Id.* at 2.

---

[31]     This article is more than ten years old, and Defendants have not adequately demonstrated that pending legal changes at the federal or state level, as referenced in the article, did not remedy the state's concerns and that the alleged abuse is still an issue twelve years later.

Even if the state had a compelling interest, Public Law 280 is not narrowly tailored. "As part of [the] narrow tailoring analysis, [the Court] consider[s] whether the rule is either under-or overinclusive." *Doe v. Mills*, 16 F.4th 20, 33 (1st Cir. 2021) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1990)). To begin, the Defendants state that they are attempting to limit abuse by *unauthorized* aliens, *see Defs.' Opp'n* at 9, but Public Law 280 discriminates against workers with H-2A visas, who are, by definition *authorized* to enter the United States for a specific purpose over a set duration. If the Defendants' goal is to target illegal immigration, this law does not do that.

Moreover, the Defendants submit that the Act is narrowly tailored "because it addresses just a single position within a single industry" and is therefore "laser-focused on . . . local problems," *Defs.' Opp'n* at 9-10, but the design of Public Law 280 is both underinclusive and overinclusive. First, the law is underinclusive because the state seeks to "minimiz[e] discrimination against domestic workers," *id.*, and decrease abuse of the H-2A visa program, but only targets one job in one industry. *Lukumi*, 508 U.S. at 547 ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited'" (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 542 (1989) (Scalia, J., concurring in part and concurring in judgment)) (internal citation omitted)). The Defendants have not demonstrated why their concerns about H-2A abuse are limited to logging truck drivers so as to justify singling out these workers.

68

Second, the law is overinclusive because, as the Plaintiffs note, the law creates a wholesale ban on any H-2A visa holder operating as a truck driver in the logging industry. A blanket ban is overbroad because it does not account for the possibility that the employee market and employer demands are not consistent in all parts of the state and across years. There may be certain parts of Maine, such as rural areas, where employer demands, and available worker pool are different from that in parts of Maine more readily accessible from a metropolitan area. The need for workers may be further inconsistent year to year. In the Court's view, Public Law 280 paints with too broad a brush.

## B.     Irreparable Harm to Plaintiffs

Having concluded that the Plaintiffs are likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued . . . injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueria*

*Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotation marks omitted) (alteration in *Braintree Lab'ys.*); *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief"). Although constitutional violations are not per se irreparable harm, certain constitutional violations are more likely to bring about irreparable harm, namely "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 484 (quoting *Pub. Serv. Co. of N.H. v. W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987)).

The Defendants claim that loss of jobs and employees by the Plaintiffs "does not constitute an 'irreparable harm' since such a loss can typically be rectified with non-equitable relief." *Defs.' Opp'n* at 17. They also argue that "the lack of irreparable harm is especially apparent if the Act does not apply to H-2A visas that were approved <u>prior to</u> the Act's effective date." *Id.* (emphasis in original).

### 1.   Stepháne Audet

The Court first considers any irreparable harm to Mr. Audet. First, assuming that Public Law 280 goes into effect prior to April 2022, when Mr. Audet's H-2A visa expires, Mr. Audet will lose his job, which would eliminate a portion of his current income; in total, his job with Pepin Lumber comprises 85% of his total income. *See*

*Audet Decl.* ¶¶ 4, 8.  "[I]t has long been held that traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable." *Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d. 22, 37 (D. Me. 2020) (quoting *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 484-85).  Were Mr. Audet to lose his job, this alone would not constitute "irreparable harm" because Mr. Audet could be compensated through a monetary award, presumably easily calculable given that Mr. Audet's employment is set to end in April 2022.

The Court's calculus is somewhat complicated by the fact that Mr. Audet has driven for Pepin Lumber on an H-2A visa for several years.  *See Audet Decl.* ¶ 10. Given that an employer's need for an H-2A visa is assessed annually, any harm to Mr. Audet in future years is purely speculative as there is no assurance that Pepin would be eligible to hire H-2A employees or would hire Mr. Audet in future years. *See Pub. Serv. Co. of N.H.*, 835 F.2d at 383 ("Speculative injury does not constitute a showing of irreparable harm").  However, given the Court's earlier conclusion that Public Law 280 is preempted, the Court concludes that Mr. Audet is likely to experience irreparable harm by having to choose between following federal law, which opens him up to liability under state law, or complying with an unconstitutional state law.[32]  *See Condon*, 961 F. Supp. at 331 ("Plaintiff is faced with the decision of either complying with regulations that are unconstitutional or

---

[32]     The Plaintiffs also argue that Mr. Audet will be irreparably harmed because Public Law 280 will revoke his H-2A visa.  However, "[t]here is no constitutionally protected interest in either obtaining or continuing to possess a visa." *Loughalam v. Trump*, 230 F. Supp. 26, 35 (D. Mass. 2017).  "The due process guaranteed by the Fifth Amendment 'attaches only when the federal government seeks to deny a liberty or property interest.'" *Id.* (quoting *Knoetze v. U.S. Dep't of State*, 634 F.2d 207, 211 (5th Cir. 1981)).  "A non-citizen has no 'inherent property right in an immigrant visa.'" *Id.* (quoting *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990)).

violating his Town's laws"). Similarly, because Public Law 280 results in a deprivation of Mr. Audet's constitutional rights, the Court concludes that Mr. Audet will be irreparably harmed by the enforcement of the Act.

### 2. Pepin Lumber

Next, the Court considers irreparable harm to Pepin Lumber. Pepin Lumber claims that Public Law 280 will permanently reduce its capacity to move logs and make a profit, resulting in irreparable harm. *Pepin Decl.* ¶ 21. The Court agrees.

First, if Public Law 280 goes into effect, Pepin Lumber will no longer be able to hire foreign workers as logging truck drivers. *Id.* ¶¶ 5-6. Pepin Lumber notes that the H-2A visa program is an important source of employees for the Company, who are hired to perform cutting and hauling work that makes up approximately 85% of the business' revenue. *Id.* ¶¶ 5-6. Pepin Lumber is located in Coburn Gore, a rural unorganized township with fewer than 100 people residing in the surrounding area, and the largest populated area, the town of Farmington, Maine, consisting of just over 7,500 residents, is ninety minutes away. *Id.* ¶ 5. Based on its remote location Pepin Lumber has historically had difficulty hiring United States workers and relies on H-2A workers to fill its needs. *Pepin Decl.* ¶¶ 5-6, 16. This year USCIS approved Pepin Lumber to hire up to thirteen H-2A visa holders as log truck drivers; Pepin Lumber currently employs six H-2A visa holders, which it claims is consistent with past years. *Id.* ¶¶ 14-16.

The Defendants argue there is no harm to Pepin Lumber because it can simply hire U.S. resident workers. *Defs.' Opp'n* at 17. However, given Pepin Lumber's difficulty hiring United States workers because of its remote location and its

historical reliance on the H-2A visa workers to drive logging trucks, the Court accepts Cédric Pepin's statement that Public Law 280 would result in a near-permanent reduction in Pepin Lumber's workforce.  If Pepin Lumber's hiring of H-2A visa holders this year is consistent with past years, as it claims, this would result in a reduction in Pepin Lumber's logging truck drivers by approximately six to thirteen employees.

While economic losses are not generally irreparable, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Bayley's Campground Inc.*, 463 F. Supp. 3d at 37 (quoting *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 485 (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995))).  Because cutting and hauling work is 85% of Pepin Lumber's revenue, a near-permanent reduction in employees would result in a corresponding decrease in revenue, which is likely to substantially impact the business.  Consequently, although the issue is closer, the Court finds that Pepin Lumber has demonstrated irreparable harm.  In light of the Court's conclusions that Plaintiffs are likely to succeed on the merits and that Public Law 280 results in the deprivation of constitutional rights, the Court concludes that Public Law 280 will result in irreparable harm to Pepin Lumber.

### 3.    Maine Forest Products Council

Finally, the Court considers irreparable harm to MFPC.  Like Pepin Lumber, many of MFPC's members operate in sparsely populated areas, have difficulty filling labor needs, including transportation needs, and therefore regularly rely on H-2A workers when they are unable to find willing and able United States workers.  *Strauch Decl.* ¶¶ 10-11.  The concerns discussed with respect to Pepin Lumber

therefore apply to other MFPC members who hire H-2A visa holders as employees. Similarly, MFPC represents "landowners" who do not have the capacity to haul their own logs and therefore rely on independent contractors, such as Pepin Lumber, to haul logs off their property and these companies, in turn, rely on H-2A labor. *Id.* ¶ 11. These landowners will be harmed if they are unable to hire independent contractors because those contractors do not have a sufficient workforce.

Ultimately, all three Plaintiffs have shown that Public Law 280 is likely to cause a deprivation of rights and the Court concludes this continued deprivation acts as an irreparable harm.

### C.   Balance of the Equities and the Public Interest

The Court must also weigh the balance of the hardships on the parties and the public interest. As noted above, the harm to the Plaintiffs if a preliminary injunction is not issued is significant and irreparable. In contrast, the Court finds any harm to the Defendants to be not as significant. The Defendants argue that a preliminary injunction will harm the "creation and preservation of jobs . . . [which are] especially important in times of high unemployment, such as now." *Defs.' Opp'n* at 18. However, as discussed above, the Defendants have not demonstrated that job creation and preservation is a serious issue in the logging industry or that Public Law 280 is likely to resolve these concerns.

As to the public's interest, the public, on one hand, has a strong interest in ensuring that there are sufficient jobs available to workers in the state of Maine. On the other hand, the public has a similarly strong interest in ensuring the constitutionality of state laws. Ultimately the Court concludes that public interest

weighs in favor of the preliminary injunction. *See Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation"). The public has a stronger interest in ensuring the constitutionality of state laws, and protecting constitutional rights, and, as the Plaintiffs note, the public has an additional interest in maintaining the supply chain as reduced capacity in labor and transportation could result in higher prices and supply chain disruptions. *Pls.' Mot.* at 18

Ultimately, the Court concludes that the Plaintiffs' constitutional challenge is meritorious. Through Public Law 280 the State enters into the well-defined federal territory of immigration and naturalization, a legislative arena generally reserved for Congress.

### D.   Summary

The Court concludes that the Plaintiffs are entitled to a preliminary injunction. Although the Court understands the state's interest in protecting Maine workers and ensuring that employers do not hire foreign workers where there are United States workers able and willing to do the job,  Congress already considered the interests of the United States workforce against an employer's need for workers and it has balanced those interests in developing the H-2A program as part of its national immigration and naturalization policy.  On the record before the Court, Public Law 280 serves as an obstacle to federal objectives and is preempted.  Furthermore, the state of Maine may have legitimate concerns about the use of H-2A visa labor in this

state; however, enactment of Public Law 280 is not a constitutional means of addressing these concerns.

## VI.   CONCLUSION

The Court GRANTS the Plaintiffs' Motion for Preliminary Injunction (ECF No. 3).  Accordingly, it is ORDERED that Defendant Patty Cormier, and any successor in office, and Defendant Aaron Frey, and any successor in office, are hereby preliminary enjoined from enforcing Public Law 280.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 18th day of February, 2022